**UNITED STATES of America,**

v.

.Mutulu **SHAKUR**, Defendant.

No. 82 Cr. 312–CSH.

United States District Court,
S.D. New York.

Feb. 19, 1987.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City (James L. Kainen, Kerri L. Martin, Asst. U.S. Attys., of counsel), for plaintiff.

Chokwe Lumumba, Brooklyn, N.Y., Jesse Berman, New York City, for defendant.

HAIGHT, District Judge:

Defendant Mutulu Shakur moves to be released from pre-trial detention and admitted to bail. His detained status and present motion are governed by the Bail Reform Act of 1984, 18 U.S.C. § 3141 *et seq.* Shakur having been detained by order of a United States Magistrate, his motion to this Court lies under § 3145(b). I consider the matter *de novo. United States v. Williams,* 753 F.2d 329, 333 (4th Cir.1985); *United States v. Thibodeaux,* 663 F.2d 520, 522 (5th Cir.1981).

## I.

Shakur is awaiting trial on an indictment returned by a grand jury of this district. Following his arrest in Los Angeles, under circumstances related *infra,* Shakur appeared before a magistrate for the Central District of California on February 12, 1986. The magistrate ordered Shakur detained without bail, finding that he posed both a danger to the community and a serious risk of flight. The magistrate thus invoked both prongs of § 3142(e). Shakur was then transferred to this district, where he was arraigned on March 7, 1986. He has been confined in the Metropolitan Correctional Center since then.

■ In this Circuit, pretrial detention on the ground of danger to the community has been held unconstitutional. *United States v. Salerno,* 794 F.2d 64 (2d Cir.1986), *cert. granted,* —— U.S. ——, 107 S.Ct. 397, 93 L.Ed.2d 351 (1986); *United States v. Melendez-Carrion,* 790 F.2d 984 (2d Cir.1986). The detention hearing before this Court in the case at bar has focused to date upon statutory detention based on risk of flight.

An otherwise divided Second Circuit panel in *Melendez-Carrion* "unanimously ruled that section 3142(e) was constitutional in permitting pretrial detention for those found to present a risk of flight." *United States v. Gonzalez Claudio,* 806 F.2d 334, 336 (2d Cir.1986). Statutory detention based on risk of flight may become so extended as to exceed constitutional limits, *Gonzalez Claudio* at 339–340 and cases cited, and Shakur contends in the alternative that those limits have now been exceeded as to him. But I need not and should not reach that constitutional issue unless I conclude that the Government has carried its burden of proof on statutory detention. *Cf. United States v. Badalamenti,* 810 F.2d 17 (2d Cir., 1987) at slip op. 1287 (statutory issue of violation of § 3142(c) "must be decided first" before resolving constitutional issue based on length of detention).[1]

## II.

■ In order to justify pretrial detention because of risk of flight, the trial judge must find that "no condition or combination of conditions will reasonably assure the appearance of the person as required," 18 U.S.C. § 3142(e). The Government bears the burden of proving that proposition by a preponderance of the evidence. *United States v. Chimurenga,* 760 F.2d 400, 405 (2d Cir.1985). In the case at bar the Government concedes that it is not aided by any of the presumptions appearing in § 3142(e)(1)–(3).

18 U.S.C. § 3142(g) provides in pertinent part:

"*Factors to be considered.*—The judicial officer shall, in determining whether there are conditions of release that will reasonably assure the appearance of the person as required ... take into account the available information concerning—

"(1) the nature and circumstances of the offense charged, including whether the

---

**1.** The Government reserves its right to argue for pretrial detention on the ground of danger to the community if it fails to persuade on the risk of flight. That reservation proceeds from the Supreme Court's grant of certiorari in *Salerno, supra.* I deal with the question further under Point III, *infra.*

offense is a crime of violence or involves a narcotic drug;

"(2) the weight of the evidence against the person;

"(3) the history and characteristics of the person, including—

"(A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

"(B) whether, at the time of the current offense or arrest, he was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law, ... "

If a defendant offers property as security under § 3142(c)(2)(K) or (L), § 3142(g) also provides:

"In considering the conditions of release described in subsection (c)(2)(K) or (c)(2)(L), the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."

█ I do not regard the factors listed by Congress in § 3142(g) as exhaustive. The trial judge may consider any factors called to his attention which bear on the issue of whether a defendant will keep his word if released on bail, or break his word and flee.

But the analysis should start with the factors specified in the statute.

1. *Nature and Circumstances of the Crime Charged.*

The nature and circumstances of the crimes charged in the indictment are very serious. Defendant Shakur and others are charged with crimes of violence culminating in loss of life. The case has come to be known as the "Brinks" case, after the unsuccessful attempt to rob an armored car operated by that company in Nanuet, New York in October 1981, during which a guard and two police officers were murdered. But the indictment also charges Shakur and others with participation in an earlier 1981 armored car robbery in the Bronx, during which a guard was murdered; and with violations of the RICO Statute, 18 U.S.C. §§ 1961, 1962(a), involving several other predicate acts constituting crimes of violence.

More particulars of the indictment appear in *United States v. Ferguson,* 758 F.2d 843 (2d Cir.1985), which rejected the appeals of certain other individuals named in the indictment who were convicted in the first trial before Judge Duffy. Shakur did not participate in the trial because he was a fugitive.

If convicted, Shakur faces a very long period of incarceration.

2. *The Weight of the Evidence Against Shakur.*

The Government's initial opposition to Shakur's bail application dwelt almost entirely upon his fugitive status for four years. The Government then made a proffer by affidavits of the evidence against Shakur in response to the Court's direction.

Much of the proffered evidence echoes evidence given at the first "Brinks" trial (*sub nom. United States v. Sekou Odinga, et al.*) by cooperating witnesses who the Government will call again. These are Tyrone Rison, Raymond Oliver, Sandra Mitchell, and Kamau Bayete. The Government, in its proffer in the case at bar, sets forth extensive testimony it expects these witnesses to give against Shakur. If the jury believed that testimony, it would clearly be entitled in law to convict Shakur on these grave charges.

The Government also refers in its proffer to a statement ascribed to Shakur during a conversation on March 8, 1982 with Edward Joseph in an apartment on Barrow Street, Manhattan. Joseph was a defendant in the first "Brinks" trial before Judge

Duffy. (He was convicted of being an accessory after the fact to the Nanuet armed robbery and murders, but acquitted on the other charges). The Government tapped the apartment's telephone and installed an electronic "bug" pursuant to Court order. The Government's proffer contends that Shakur can be heard describing the Nyack incident on October 20, 1981 in these words:

> "I thought those guys would move. Weems, he was to go back with Elizabeth but Elizabeth fucked up and I'm about, I, I, I, almost got in front of you as the cop shot with the shotgun."

Martin affidavit at ¶ 17.

The transcript the Government proposes to submit to the jury with this tape has Shakur saying this:

> (UI) cut the wheels (UI) I thought those guys would move. Weems he was to go back with Elizabeth but Elizabeth was fucked up. And I'm about, I, I, I almost got in front of you as the cop shot with the shotgun. (Speaks quickly) We had to do it. I mean, I mean, that cop moved. Boom. You know what I'm sayin'? (Laughs) Cause they all seen us when we got out, out of there. They don't have enough evidence. They have, have no witness.

Shakur's counsel says he cannot hear those particular words on the tape. Lumumba affidavit at ¶ 39. (Apparently defendant does not dispute that the conversation is one between Joseph and himself).

The Government states that its proffer does not constitute all the evidence it will offer against Shakur at trial. Accepting that, it nonetheless seems likely that the Government has put its best foot forward.

I will deal further with the tape *infra.* But it does seem fair to say that the Government's case against Shakur will depend primarily upon the testimony of informants, of whom Rison is the most important. Based on the first trial, Rison may be expected to testify that he, Shakur, and three others (including Odinga) formed the core of a criminal enterprise known as "the Family." According to Rison, the Family's core members, with the intermittent assistance of others, some of whom were defendants in the first trial, planned and carried out the series of violent crimes alleged either as predicate RICO acts or as separate substantive counts. The other informants are prepared to corroborate Rison to various degrees, and to add limited observations of their own.

All informants were, and are, vulnerable to cross examination on the issue of credibility. The results of the first trial represented a mixed bag. The Second Circuit summarized the jury's verdicts in *Ferguson, supra,* at 847–848:

> Odinga and Baraldini were found guilty on Counts one (RICO Conspiracy) and two (substantive RICO violation). These were the only counts for which Baraldini was indicted. Odinga was acquitted on Counts three through eight—those involving bank robbery, armed bank robbery, and murder in the commission of the two 1981 armed bank robberies. Ferguson and Joseph were found guilty as accessories after the fact to the bank robbery and armed robbery alleged in Counts six and seven (the 1981 Nanuet, New York armed robbery and murder). But they were acquitted on the charges specified in Counts one and two (the RICO counts) and on Counts six, seven, and eight. Two defendants—not involved in this appeal—were acquitted on all nine charges.

It is clear enough from this summary that the jury rejected the informants' testimony in significant measure. For example, Rison squarely implicated Odinga in the Bronx and Nyack 1981 armored car robberies. Affidavit of AUSA Martin at ¶¶ 12–14. Odinga was acquitted on those charges.

Because defense counsel raised an audibility issue about the words ascribed to Shakur on the March 8, 1982 tape, I have listened to it in chambers, armed with the transcript the Government intends to offer.

 The tape is of generally poor quality. However, it passed audibility muster before Judge Duffy and was admitted on the first trial against Joseph. Of course, Shakur is not bound by that ruling;

and in any event Joseph's voice tends to be more distinct than that of Shakur. Tape recordings are admissible "unless the incomprehensible portions of the tapes are so substantial as to render the recordings as a whole untrustworthy." *United States v. Robinson,* 763 F.2d 778, 781 (6th Cir.1985). Without foreclosing further argument on the point, it does not seem to me that this tape can be condemned on that ground. The particular words cited by the Government are very difficult to make out, but with the assistance of the transcript I was just barely—I choose my words advisedly—able to do so. Transcripts may be given to the jurors, provided that the trial judge cautions them that they are nonbinding guides, subject always to the jurors' assessment as to accuracy. *United States v. Vasquez,* 605 F.2d 1269, 1272 n. 4 (2d Cir.1979). If the parties disagree on what is said, two versions of the disputed portion may be submitted to the jury. *United States v. Carson,* 464 F.2d 424 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972).

While there are other portions of this tape, clearly audible, which arguably incriminate Shakur in respect to the Nyack incident, only the quoted words tend to actually place him at the scene. The jury could hear what the Government hears, but it could also fail to do so.

Thus judging by the Government's proffer and the decidedly mixed results of the first trial, the Government's proof against Shakur can hardly be regarded as open and shut. There appears to be a relative paucity of independent, noninformant evidence against him. Shakur, presumptively innocent and with no prior criminal record, would appear to have some prospect of acquittal.

### 3. *Shakur's History and Characteristics.*

Evidence on these subjects is derived from a number of witnesses who appeared before me; affidavits and letters submitted on his behalf; and my own questioning of the defendant on the last day of the hearing.

In addition, there is the evidence of Shakur's fugitivity (which counts against him unless satisfactorily explained); and the absence of any prior convictions, which is in his favor.

On the question of fugitivity, Shakur contends that he harbored legitimate concerns for his safety, in view of his perceived excessive actions of law enforcement agents. For that reason, he rejects the characterization "fugitive."

I find that prior to the events in question, Shakur had been an active black nationalist, and had conducted research into the F.B.I.'s illicit COINTELPRO programs, particularly that program directed against "Black Nationalist Hate Groups." More recently, events subsequent to the October 1981 Brinks episode are identified by Shakur as causing him concern. For example, Fulani Sunni Ali, a Brinks suspect against whom charges were ultimately dropped, was surrounded in a woodland house in the company of other women, children, and a sixty-year old man, and captured by a force of over a hundred armed men backed up by tanks and helicopters.

Given the unhappily well documented excesses of some (although certainly not all) law enforcement agencies in relation to particular groups and organizations, I cannot characterize as inherently implausible Shakur's statement that after the Brinks incident, he was "legitimately cautious, concerned and fearful" of the commission of criminal acts against him "under a pretext of arrest." Shakur affidavit at ¶ 6. More troublesome in the present context is Shakur's failure to arrange, with the assistance and protection of counsel, to surrender at any time between his flight in March 1982 and arrest in February 1986. He acknowledged in response to my questions that a surrender had never occurred to him (hearing of January 28, 1987 at Tr. 14), adding that now he has been "captured" he is prepared to use the Court system as an "opportunity" to show to the community his commitment to his case and beliefs. *Id.* at 14–16.

The Government presses Shakur's fugitivity as rendering "his belated bail argu-

ments completely untenable." Martin letter of January 6, 1987 at 2. Reference is made to *United States v. Bailey*, 444 U.S. 394, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980), where the majority held that in a prosecution for escape, an escapee is not entitled to have the jury consider a defense based on intolerable prison conditions in the absence of evidence of a bona fide effort on his part to surrender after the escape.

The analogy is not complete. *Bailey* deals with the requisite elements of a prosecution for a past escape. The majority viewed non-surrender as fatal to the defense of duress. In the case at bar, I must consider the extent to which Shakur's past non-surrender foretells his future conduct: compliance with his bond, or breach and flight.

■ Shakur's non-surrender militates against his release on bail, but in my view is not fatal to it. As noted, there is a plausible explanation for his original flight. The concerns Shakur says he felt for his safety in 1982 would not be lessened as the consequence of flight in 1987; there is also a plausible ring to Shakur's explanation of why, if released on bail, "I am not going to go anywhere":

Now, my face is all over America in wanted posters in post offices, in police stations. I am a target for any trigger-happy cop that wants to kill me, that's a fact.
Tr. 18.

By contrast, if Shakur is released on bail by this Court, under whatever reporting conditions may be devised, he is in a sense under the protection of this Court, as well as subject to its orders.[2] I detect that perception in this defendant.

I have also made Shakur specifically aware that if he flees and is again apprehended, he will face a ten-year term of imprisonment in a prosecution where, unlike the present indictment, there would be no possible doubt of the outcome. Shakur understands that (Tr. 8–9), and, given his perceptions of his role in the community

and the importance of his work, I believe that awareness militates against flight.

Mutulu Shakur was, prior to these incidents, a practicing licensed acupuncturist of international reputation. He has practiced acupuncture in his community, with a particular emphasis on that mode of treatment as a preferable alternative to methadone maintenance for drug addiction. Shakur's application for bail is supported by the testimony or written statements of an impressive number of prominent professionals and others.

■ Shakur characterizes himself as "a New Afrikan Freedom Fighter." Affidavit at ¶ 1. This is a reference to the efforts of groups to which Shakur belongs to build "an independent New Afrikan State in the southeastern Black belt in the areas now known as Alabama, Mississippi, Georgia, Louisiana, and South Carolina." Affidavit of Chokwe Lumumba, counsel for Shakur, verified October 15, 1986 at ¶ 32. "New Afrikans" are "Black People". *Ibid.* As a "prisoner of war", Shakur has voiced a demand "to be treated in accordance with the Geneva Convention." Shakur affidavit at ¶–2. If this is intended as a challenge to the Court's subject matter jurisdiction, no motion has as yet been filed. I estimate no present view on the question. But Shakur is entitled to challenge the Court's jurisdiction; and I do not equate that entitlement or intent with a likelihood of flight if Shakur is released on bail and the jurisdictional motion denied.

The Government clearly does not regard Shakur as a "freedom fighter", and would apply other terms to him. I need not concern myself with terminology. In *Claudio Gonzalez, supra,* Judge Newman dealt with a defendant's argument that "[o]ne person's 'terrorist' is often another person's 'freedom fighter' " by saying: "That observation concerns motivation, not risk of flight." 806 F.2d at 338 n. 4. In the bail context, prior acts count for more than present labels. *Claudio Gonzalez* teaches

2. I do not mean by this discussion to suggest law enforcement officers would misbehave in apprehending Shakur if he violated his bond

and fled. I am concerned only with Shakur's past conduct and present frame of mind (as best I can discern it) as indicia of his future conduct.

that conduct causing the loss of innocent life "whatever the motivation, is relevant in deciding whether its perpetrators are likely to have sufficient respect for law to attend their criminal trial." *Ibid.* The Second Circuit affirmed Judge Clarie's findings that the defendants in *Claudio Gonzalez* represented an unacceptable statutory risk of flight (although ordering their release on constitutional grounds). The proferred proof of those defendants' conviction to the offense charged appears to have been stronger than in the case at bar. *See* discussion at 806 F.2d 337–38.

### 4. *Property To Be Posted As Security.*

An additional factor recognized by the statute and caselaw is the moral suasion against flight generated by the posting of other persons' property as security. *United States v. Chimurenga, supra,* is illustrative. In that multidefendant, multi-conspiracy, RICO indictment the Government charged Coltrane Chimurenga with being "the leader of a successor group to a group of individuals known as the 'Family' ..." which "was responsible for an armed robbery in Nanuet, New York, which resulted in the death of an armored truck guard and two police officers." 760 F.2d at 402. In other words, Chimurenga was alleged to head the successor group to the group Shakur allegedly co-founded. Despite what appears to be a considerable body of evidence against him, *ibid,* Judge Carter (reversing Magistrate Grubin) admitted Chimurenga to bail, and the Second Circuit affirmed. These courts were influenced by the willingness of Chimurenga's two brothers to post a money bond of $500,000, "secured by three residences with a claimed value of about $270,000." *Id.* at 403.

In the case at bar, Shakur states through his attorney, Mr. Lumumba, that six individuals (or couples) are willing to pledge their homes. The details are given in Mr. Lumumba's letters to the Court dated January 7 and 23, 1987, which I attach to this opinion as Appendices A and B. The total values are estimated at $508,000. The properties are encumbered to greater or lesser degrees by mortgages. Owners' equitites are said to total $314,000.

The pledgors are Shakur's wife, friends, and Mr. Lumumba, one of Shakur's attorneys. The friends include Jonathan Lubell and Mary O'Melveney, prominent attorneys of this City. They will pledge their Manhattan cooperative apartment valued at "at least $300,000" with an outstanding mortgage balance of $140,000. Lumumba letter of January 22, 1987, Appendix B.

Mrs. Shakur's Texas property, valued at only $5,000 and quite possibly exempted from forfeiture by Texas homesteading laws (see letter of AUSA Martin dated February 2, 1987 and enclosures), is of little economic significance. But the other properties would appear to represent significant undertakings by individuals who would suffer considerably if Shakur broke his word and these properties were forfeited.

### 5. *Other Available Restrictions.*

To bond requirements and security, the Court may add "strict curfews and reporting obligations." *Chimurenga* at 403. The statutory inquiry is into the effectiveness of any "condition or combination of conditions" to reasonably assure the defendant's appearance.

### 6. *Shakur's Responses to the Court's Questions.*

I placed Shakur under affirmation in open Court and put to him a series of questions designed to assist me in evaluating risk of flight if I admitted him to bail. The Government was permitted to suggest questions in advance. Some I adopted, others I rejected. Defense counsel were permitted to advise their client not to answer a particular question. On one occasion they did so. Counsel were not permitted to put direct questions.

The hearing was attended by a considerable number of Shakur's friends and supporters. Many others, including lawyers and doctors, have testified before me or written to me to state that they know Shakur, have worked with him, respect him, and expect him to keep his word.

I mention this because when in the presence of these witnesses Shakur swore, as he did, that he would not flee, but instead seek to use the trial as a vehicle for vindication not only of himself but his beliefs, he gave that promise not only to the Court but to his followers and friends as well, including most particularly those whose homes Shakur would forfeit by fleeing. I believe an element of moral suasion is present.

The Government dismisses Shakur's assurances as "obviously self-serving", Martin letter of February 2, 1987 at 1. Technically that is true, in the sense that Shakur did not say he would flee if released, he said he would keep his word. But the question turns more on the sincerity than on the predictable substance of Shakur's promises. Recognizing that one man can never truly know another's mind and heart, I am inclined to credit Shakur.

I do so in part because of his demeanor, but also because it is evident that Shakur and his counsel have much in mind the Government's partial failure in *Ferguson*. In addition, COLTRANE CHIMURENGA, who Judge Carter admitted to bail over the Government's strenuous objections, remained true to his bond (as did his co-defendants), appeared throughout the trial, and was acquitted on all the more serious charges, including being the successor to the criminal "Family" allegedly co-founded by Shakur. If, as I believe, Shakur and his attorneys genuinely entertain a hope of a acquittal at trial, it argues against Shakur's casting it away, and sentencing himself to a life of exile and an additional and certain ten-year term for bail jumping if again apprehended.

Finally, Shakur and his counsel argue that the faithfulness of Chimurenga and his co-defendants, in contradiction of the Government's dire predictions, supports Shakur's present application. There is some force to this; but Shakur must realize that if, unlike Chimurenga, he breaks his word, that faithlessness may redound to the detriment of future bail applications of others. Shakur's flight would thus constitute a betrayal on several levels.

The difficulty remains that Shakur was evidently quite prepared to lead a life of exile after March 1982, and would undoubtedly be doing so still if he had not been arrested. It is a troublesome circumstance; but in the totality of circumstances I do not regard it as decisive.

### III

I conclude that the Government has not sustained its burden of proving that no condition or combination of conditions will reasonably assure the appearance of Shakur as required during the course of this trial. I recognize that releasing this defendant on bail is not risk-free. As Judge Newman wrote in *Gonzalez Claudio, supra*, at 343, the release of defendants "upon reasonable conditions creates a risk that they may flee." Dr. Shakur's promises may be lies. He may be conning this Court and his friends who entrust their homes to him. I do not think so. Time will tell. The statute speaks not in terms of certainty, but of conditions that will "reasonably assure" the defendant's appearance. The Government has not proved that no combination of conditions exists which rise to that level.

Accordingly Shakur will be admitted to bail, subject to the following terms and conditions:

1. He will execute a personal recognizance bond of $500,000, to be secured by a pledge of the real property referred to in Appendices A and B of this opinion. That bond must be co-signed by Dolores Porter, Shakur's mother, who testified at the hearing that, because of her faith in her son, she was willing to place her possessions at risk to obtain his freedom on bail. Tr. 159. The bond must also be co-signed by Makeni Shakur, the defendant's wife.

2. Shakur will surrender his passport if he has one.

3. Shakur will not travel beyond the boundaries of the Southern and Eastern Districts of New York.

4. Shakur will report in person every morning, seven days a week, between the hours of 8:30 a.m. and 9:30 a.m. to a repre-

sentative of the Pre-trial Services Agency and/or the United States Attorney's Office, Federal Bureau of Investigation or other law enforcement agency to be designated in writing by the office of the United States Attorney.

5. Shakur will telephone a representative of such designated agency or agencies every afternoon, seven days a week, between the hours of 2:00 p.m. and 3:00 p.m., giving a telephone number within the Southern or Eastern Districts of New York at which he may be telephoned back. Shakur is to remain at that number until he is called back, which should be done promptly.

6. Adopting the procedure followed by Magistrate Grubin in the *Chimurenga* case (opinion of November 5, 1984 at p. 25), Shakur is directed to be in his residence within the Southern or Eastern District of New York from 8:00 p.m. every night until 6:30 a.m. the following morning. The Government is authorized to make random and periodic, but reasonable, checks at Shakur's residence to verify compliance with this condition. The United States Attorney shall designate in writing the Government officers who shall be responsible for these checks. Such officers are not authorized by this order to enter Shakur's residence, but Shakur is required to appear at the door of the residence when an officer arrives. The only exceptions to this curfew shall be on those occasions when Shakur is required to work late into the evening with counsel at counsel's offices in preparation for trial or related procedures. On such occasions counsel are required to contact the designated law enforcement officer in advance to inform him that Shakur will be with counsel at a specified address and telephone number, and to contact the officer again when Shakur leaves for his residence. The Government may also, if it wishes, arrange for surveillance of Shakur, provided it is not harassing in nature.

7. Shakur is required to refrain from committing any federal, state, or local crime.

8. Shakur is required to comply with any order of this Court made in the context of this trial, including without limitation any order to give handwriting or hair exemplars.

I stay the admission of Shakur to bail pending appraisal of the pledged property and the recording of the necessary mortgages. *United States v. Chimurenga, supra,* at 760 F.2d 403.

I also stay the effectiveness of this order for fourteen (14) days from the date hereof to permit the Government, if so advised, to file a notice of appeal with a request that the appeal be expedited, and pending resolution of the appeal if a notice if filed.

If so advised, the Government may apply within fourteen (14) days of the date hereof to detain Shakur pending trial on the ground that his release on bail would constitute a danger to any other person and to the community. The Government is not foreclosed from making such an application by the law in this Circuit because the Court of Appeals has stayed its mandate in *United States v. Salerno, supra,* pending resolution of that case in the Supreme Court. The Government's burden of proof on that aspect of the statute is to demonstrate by clear and convincing evidence that Shakur is dangerous. *Chimurenga, supra,* at 405. If the Government elects to proceed in this fashion, its initial proffer will be by affidavit, as in the past. I will consider the proffer and then determine whether a response from defendant is required.

The foregoing is SO ORDERED.

## APPENDIX A

CHOKWE LUMUMBA, ESQ.

2108 Kenmore Terrace
Brooklyn, New York 11226
(718) 287–5885

January 7, 1987

Judge Charles Haight, Jr.
United States District Court
Southern District of New York
40 Centre Street
New York, New York 10007

Re: *U.S. v. Mutulu Shakur*
 SSS 82 CR. 312 (CSH)

Dear Judge Charles Haight:

The following are persons who have pledged their property to secure Dr. Shakur's release on bond.

1. Makeni Shakur, for Nzinga Shakur-Ali (age 5) and Chinua Shakur (age 4). Nzinga and Chinua are the children of Makeni and Mutulu Shakur. Makeni is Mutulu's wife. The home which they are prepared to pledge is one which is held in trust for the two children. The home is located at Route 3—Box 127 E-1, Jefferson, Texas 75657 (Marion County). The approximate value of this property is $5,000. The property was assessed at this price about 6 months ago. Makeni and her children live in the house most of the year.

2. Edward Hight and Antoinette Carter will offer the home that they jointly own at 234 East 124th Street, Los Angeles, California 90061. This home is valued at $40,-000 to $50,000. There is a $17,000 mortgage remaining. Mr. Hight and his family live in the house at the present time.

3. Sekou Owusu (s/n Ray Nero) and his wife Denise Howell-Nero are prepared to provide as security the home which they live in along with their child. This home is located at 146 Decatur Street, Brooklyn, NY 11233. The value of this home has been appraised at $45,000 in 1981. In 1984, a similar home on the same block sold for $60,000. The approximate value of the 146 address at this time is between $70,000 and $80,000. The home has a $22,000 mortgage remaining.

4. Shaheem Jabbar (s/n John Crenshaw) is prepared to provide his home as security also. This house is located at 683 East 232 Street, Bronx, New York. The value of this house is now approximately $50,000. The house was assessed for purposes of fire insurance at a value of $38,-000 in 1979. A $2,000 mortgage remains unpaid.

5. Chokwe Lumumba and Patricia deJesus are prepared to provide as security their property at 14831 Prevost, Detroit, Michigan 48227. Their home has an estimated value of approximately $35,000. The home was purchased in 1978 for $27,-000. There is approximately a $13,000 balance remaining on the mortgage. I am presently checking the Professional Code of Conduct for attorneys in Michigan and New York to see if it is permissible to secure a client's bond with my property.

Both Ms. Carter and Mr. Hight who are prepared to provide their Los Angeles property are friends of Dr. Shakur and are members of the New Afrikan Peoples Organization. This organization is a central part of the New Afrikan Independent Movement. Dr. Shakur is a prominent participant in this movement.

Shaheem Jabbar is also a member of the New Afrikan Peoples Organization and a close friend of Dr. Shakur.

There are other persons prepared to offer their property as security for Dr. Shakur's bond. Inability to contact the same over the holidays leaves us without the specifics on their property at this moment. These sources will be contacted by Friday and the court will be advised by early next week as to the location and value of the property in question.

Sincerely yours,

/s/ Chokwe Lumumba

Chokwe Lumumba, Esq.

## APPENDIX B

### CHOKWE LUMUMBA

ATTORNEY AT LAW
13206 DEXTER AVENUE
DETROIT, MICHIGAN 48238
(313) 883-3312

January 22, 1987

Honorable Charles Haight, Jr.
United States District Court Judge
Southern District of New York
Room 307
40 Centre Street
New York, New York 10007

Re. U.S. v Mutulu Shakur
# SSS 82 CR 312
(CSH)

Dear Judge Haight:

This letter is written to provide you with further information regarding property

pledged for Dr. Shakur's bail, should he be granted same.

Attornies Jonathan Lubell and Mary O–Melveny will provide their cooperative apartment for the bail. Their property is located at 130 Jane Street, Apartment 5A–6A, New York, New York 10014. The total value of the property is at least $300,-000.00. There is an outstanding mortgage balance of $140,000.00. Thus, the equity owned by Attorney Lubell and Attorney O–Melveny is about $160,000.00.

Sincerely,
/s/Chokwe Lumumba
Chokwe Lumumba
2108 Kenmore Terrace
Brooklyn, N.Y. 11226
718/ 287–5885

cc AU.S.A.
James Kainen