UNITED STATES of America,
Appellant,

v.

Mutulu SHAKUR, Appellee.

No. 1023, Docket 87–1103.

United States Court of Appeals,
Second Circuit.

Argued March 27, 1987.

Decided April 10, 1987.

James L. Kainen, Asst. U.S. Atty., S.D. N.Y. (Rudolph W. Giuliani, U.S. Atty. and Kerri L. Martin and Bruce A. Green, Asst. U.S. Atty., on the brief), for appellant.

Chokwe Lumumba, Brooklyn, N.Y., for appellee.

Before TIMBERS, KEARSE and PIERCE, Circuit Judges.

TIMBERS, Circuit Judge:

Appellant United States of America ("the government") brings this expedited appeal from an order entered February 19, 1987 in the Southern District of New York, Charles S. Haight, Jr., *District Judge*, 656 F.Supp. 241, granting an application by appellee Mutulu Shakur ("Shakur") for release from pretrial detention on certain conditions.

Shakur filed the instant application eight months after his arrest and initial detention. The government opposed the application on the ground that, under the Bail Reform Act of 1984 ("the Act"), Pub.L. No. 98–473, § 203(a) *et seq.*, 98 Stat. 1976 (codified at 18 U.S.C. § 3141 *et seq.* (Supp. III 1985)), Shakur was likely to flee if not detained.

The district court, after an evidentiary hearing, held that the government had failed to sustain its burden of showing that no condition or combination of conditions could be imposed on Shakur which reasonably would assure his presence at trial. The court therefore granted the application. The court stayed the effectiveness of its order pending the outcome of an appeal to our Court.

On appeal, the government claims that the district court was clearly erroneous in holding that the government had not proven by a preponderance of the evidence that there were no conditions which reasonably would assure the presence of Shakur at trial.

We hold that the district court erred when it held that conditions could be imposed which reasonably would assure the presence of Shakur at trial. This holding rests on errors of law as well as on clearly erroneous findings of fact.

We reverse.

## I.

We summarize only those facts believed necessary to an understanding of the issues raised on appeal.

On March 25, 1982, a magistrate in the Southern District of New York issued a warrant for the arrest of Shakur, Edward Joseph, and Cecil Ferguson on charges arising from the armed robbery of a Brinks armored truck on October 20, 1981 in Nanuet, New York. Joseph and Ferguson were arrested the following day. Their arrests received national press coverage.

Attempts to locate Shakur were unsuccessful. Investigations conducted by the New York Joint Terrorist Task Force of the Federal Bureau of Investigation ("the FBI") indicated that after the Brinks robbery Shakur had not returned to his New York home—an acupuncture clinic located at West 139th Street in Manhattan. He had been observed on several occasions entering an apartment in Greenwich Village, New York, but could not be located there after issuance of the arrest warrant.

Subsequent information led the FBI to Washington, D.C., where it discovered that Shakur had rented an apartment under the fictitious name of "Donell Jackson". Coordinated efforts between the FBI and local authorities failed to locate Shakur at the apartment. He was last seen in Washington, D.C. in June 1982.

On July 23, 1982, the FBI placed Shakur on its list of "Ten Most Wanted Fugitives". Posters containing his photograph were circulated throughout the nation to federal and state law enforcement agencies, post offices, and the news media.

On November 24, 1982, while Shakur remained at large, he and others were indicted in the Southern District of New York in Indictment SSS 82 Cr. 312 ("the indictment"). The indictment charges Shakur in eight counts. Count One charges that Shakur and others conspired to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), in violation of 18 U.S.C. §§ 1961 and 1962(d) (1982 & Supp. III 1985). Count Two charges Shakur with participation in a racketeering enterprise in violation of 18 U.S.C. §§ 2, 1961, and 1962(c) (1982 & Supp. III 1985), in that Shakur participated in the commission of 19 separate predicate acts of racketeering. Those acts included three murders (two of which were murders of law enforcement officers); three armed robberies of armored trucks, and one bank robbery (the

robberies together having netted the enterprise nearly $2.5 million); seven attempted armed robberies of armored trucks; and two armed kidnappings. The indictment charges that the kidnappings were committed to effectuate the escape from prison of Black Liberation Army leader Joanne Chesimard, who herself was incarcerated for participating in the shooting death of a New Jersey State Trooper. The other counts of the indictment naming Shakur charge him with participation in two bank robberies in violation of 18 U.S.C. §§ 2 and 2113(a) (1982), two armed bank robberies in violation of 18 U.S.C. §§ 2 and 2113(d) (1982), and two bank robbery killings in violation of 18 U.S.C. §§ 2 and 2113(e) (1982). The indictment charges that the armed bank robberies were committed with the use of nine-millimeter handguns, shotguns, and M–16 automatic rifles.

In the aggregate, the charges against Shakur carry a maximum prison sentence in excess of two life terms and a possible fine of $80,000.

Shakur remained a fugitive throughout a five month trial of his alleged co-conspirators during the Spring and Summer of 1983. *United States v. Ferguson*, 758 F.2d 843 (2 Cir.), *cert. denied*, 106 S.Ct. 124 (1985).

A continuing investigation into the whereabouts of Shakur and Cheri Dalton, another fugitive charged in the indictment, led the FBI to Los Angeles, California. There it learned that Shakur and Dalton had resided together under the fictitious names "David and Claudia Bryant" until May 1985, the month of the arrest of Marilyn Buck. Buck was another Brinks fugitive and now is Shakur's codefendant. *See United States v. Buck*, 813 F.2d 588 (2 Cir.1987).

Shakur's four year elusion of the FBI came to an end on the morning of February 11, 1986, when he was arrested on a Los Angeles street by FBI Special Agent David Mitchell. At the time of his arrest, Shakur was in possession of a California driver's license under the fictitious name of "Eugene Allen". The license listed a fictitious address and a fictitious date of birth as well.

Shortly after Shakur's arrest, Agent Mitchell discovered a flyer entitled " 'BY ANY MEANS NECESSARY' " in a public place in Los Angeles. The flyer purported to have been published by the "New Afrikan People's Organization". It was subtitled:

"STRUGGLE FOR THOSE THAT STRUGGLE FOR YOU
MUTULU SHAKUR: FREEDOM FIGHTER, NOT A TERRORIST".

The flyer asserted that "[t]he U.S. court system, in actual fact, has no moral or legal right to try Dr. Shakur.... We support Dr. Shakur being flown to a country where human rights are respected." The flyer concluded by urging fellow supporters to **"Free Mutulu Shakur Now!"**

On February 18, 1986, a magistrate in the Central District of California ordered Shakur detained for trial on the grounds that he posed both a risk of flight and a danger to the community. 18 U.S.C. § 3142(e). Shakur waived formal extradition proceedings. He was transported in custody to the Southern District of New York, where he was arraigned on the instant indictment on March 7, 1986. As he was led into the courtroom to be arraigned, Shakur announced to his supporters that he brought them greetings from "Nehanda", a name by which Dalton, still a fugitive, is known among Shakur's supporters. After pleading not guilty to the charges in the indictment, Shakur once again addressed his supporters:

"I would like to first thank all of my supporters who have come out here today. Secondly, I wish to apologize for being caught. I am a New Afrikan Freedom Fighter....

As a captured freedom fighter of the New African Nation I am a prisoner of war. I demand to be treated in accordance with the Geneva Convention."

On October 15, 1986, eight months after his arrest and initial detention, Shakur filed the instant application pursuant to 18 U.S.C. § 3145(b) to be released on bail pending trial. In an affidavit filed by his

attorney, it was urged that Shakur's departure from New York and fugitive status should be discounted on two grounds: first, it was asserted that the government would be unable to show that he had left New York while an arrest warrant was outstanding against him; and, second, implying that he justifiably had remained a fugitive, it was claimed that there was "evidence to show that the reckless, brutal warfare waged against New Afrikan Political Activists after October 20, 1981 created every objective reason to believe that the lives of Dr. Shakur and of numerous others were in danger if seized by US Law Enforcement or local American Law Enforcement Personnel."

In papers filed October 22, the government opposed the application on the ground that Shakur poses a serious risk of flight and "no condition or combination of conditions will reasonably assure [his] appearance as required." 18 U.S.C. § 3142(e).

The district court heard initial arguments on the application on October 24, 1986. At the court's invitation Shakur submitted his own affidavit on October 30. In his affidavit, Shakur again demanded "to be treated in accordance with the Geneva Convention" since he was "a captured Freedom Fighter of the New Afrikan Nation" and "a Prisoner-of-War". He asserted that "I have never been a fugitive from Justice" but rather was "legitimately cautious, concerned and fearful of the U.S. Government's potential and likelihood of committing criminal acts against me under a pretext of arrest." In explaining that "my security will be enhanced and my security concerns even further reduced" by release on bail, Shakur averred that "I am encouraged presently by the even handed manner in which the present court has considered and ruled on motions brought before it by my codefendant.... This certainly has positively effected [sic] my view of my security." One of the "motions" to which Shakur referred apparently was a motion by Buck to suppress certain evidence against her. *See Buck, supra,* in which our Court reversed two pre-trial orders entered October 24 and December 3, 1986, respectively, by Judge Haight suppressing certain evidence against Buck.

In a supplemental affidavit filed in the instant case on December 3, 1986, Shakur's counsel requested an evidentiary hearing to "establish the reasonable basis for and existence of fear on behalf of Dr. Shakur for his safety and the safety of others during a period when he was absent from the jurisdiction of the Southern District of New York." The district court held an evidentiary hearing on December 22–23, 1986. Shakur called seven witnesses, most of whom were either members of his family or his political supporters. None of the witnesses testified to any contact or conversations with Shakur during the years he was a fugitive. Rather, to the extent that the testimony could be considered relevant to the question of Shakur's motivation for flight, the witnesses related their own perceptions of public events and testified to conversations with Shakur which took place either prior to the date he left New York or subsequent to the date of his arrest. Some of the witnesses testified regarding Shakur's service to the community and reputation for truth and veracity.

In letters dated January 7 and 22, 1987, Shakur's counsel provided the court with lists of persons who were willing to pledge their real property to secure Shakur's release on bond. Among the persons listed were members of Shakur's family, his "close friend[s]", "members of the New Afrikan Peoples Organization", and Shakur's present counsel.

The district court reconvened the hearing on January 28, 1987 to call Shakur as its witness. The court permitted the government to submit questions for the court to propound, but neither defense counsel nor the government was permitted to question Shakur directly. Shakur was permitted to consult with his counsel before answering any particular question and to refuse to answer any question if his counsel so advised. Based on his counsel's advice, Shakur declined to answer the court's question whether he had "for at least some time prior to [his] arrest [known] that [he was] being sought by this court to answer ...

charges." At another point in the proceedings the following colloquy occurred:

"Q. [by the court] Is it fair to say, then, that you regard this trial in this court as an opportunity to say things which you regard as important to say?

A. No question. I think that not only myself, I think that there will be a proflery of people hopefully that will represent the struggle that I participated in as one individual, not a mastermind, but an individual committed to it, that will represent the seriousness and the consequences of our struggle of the new African people.

Q. In light of those considerations, Dr. Shakur, did it occur to you at any time prior to your arrest on the West Coast in February of 1986 to return to this court so that at an earlier time that effort at vindication and explanation could take place?

MR. LUMUMBA [Shakur's counsel]: May we confer?

THE COURT: You may.

(pause)

MR. LUMUMBA: We have no advice to give him.

THE COURT: All right.

A. When you say 'this court,' you, as personalizing it—

Q. Well, I don't mean me, I mean the Federal Court for the Southern District of New York dealing with the charges with which you are confronted.

A. No.

Q. That had not occurred to you?

A. No."

Shakur also stated that if he was released on bond it would be "under my strategy" to participate in the trial. Shakur indicated that his supporters who were willing to pledge their property for his bond "would be very upset" if he violated the conditions of his bail.

In an opinion and order entered February 19, 1987, the district court granted Shakur's application for release from pretrial detention. The court recognized that "releasing this defendant on bail is not risk-free", that "Shakur's promises may be lies", and that Shakur "may be conning this Court". Concluding that it "[d]id not think so" and that "[t]ime [would] tell", however, the court held that "the Government has not sustained its burden of proving that no condition or combination of conditions will reasonably assure the appearance of Shakur as required during the course of this trial." The court ordered Shakur to be released on bail subject to certain conditions. Those conditions include, among others, that Shakur execute a $500,000 personal recognizance bond to be secured by real property pledged by Shakur's attorney, family members, friends, and supporters, and that Shakur maintain daily contact with the office of the United States Attorney through a variety of procedures.

On February 23, 1987, the government filed a notice of appeal pursuant to 18 U.S.C. §§ 3145(c) and 3731 (1982 & Supp. III 1985). We ordered that the appeal be expedited.

For the reasons set forth below, we reverse the order of the district court.

## II.

A. *The Statutory Scheme and the Standard of Review.*

■ The Act provides that a court should order a defendant detained pending trial if "no conditions or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e). We have interpreted § 3142(e) to require a district court to engage in a two step inquiry before ordering a defendant released or detained pending trial. *United States v. Berrios-Berrios,* 791 F.2d 246, 250 (2 Cir.), *cert. dismissed,* 107 S.Ct. 562 (1986).

First, the court must make a finding as to whether the defendant presents a risk of flight if not detained. *Id.; see United States v. Martir,* 782 F.2d 1141, 1146 (2 Cir.1986) (factors to be considered in making a finding whether a defendant presents a risk of flight).

■ Second, if the court finds that a defendant is likely to flee, then the court

must proceed to the second step of the inquiry, namely, whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released. *Berrios-Berrios, supra,* 791 F.2d at 250. The burden of proof is on the government to prove the absence of such conditions by a preponderance of the evidence. *United States v. Chimurenga,* 760 F.2d 400, 405 (2 Cir.1985); *see United States v. Gotti,* 794 F.2d 773, 777 (2 Cir.1986). Congress has set forth in the Act certain categories of factors that a district court must take into account in conducting this inquiry. 18 U.S.C. § 3142(g). Among those factors are "the nature and circumstances of the offense charged", *id.* § 3142(g)(1); "the weight of the evidence against the person", *id.* § 3142(g)(2); and "the history and characteristics of the person", *id.* § 3142(g)(3). In applying the factors to any particular case, the court should bear in mind that it is only a "limited group of offenders" who should be denied bail pending trial. S.Rep. No. 225, 98th Cong., 2d Sess. 7, *reprinted in* 1984 U.S.Code Cong. & Ad.News 3182, 3189.

Our review of a district court's finding as to a defendant's propensity to flee is limited to the clearly erroneous standard of review. *E.g., United States v. Melendez-Carrion,* 790 F.2d 984, 994 (2 Cir.1986). In other words, we will disturb the district court's finding only if " 'on the entire evidence' " we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395 (1948)). *Cf.* Fed.R.Civ.P. 52(a). The clearly erroneous standard of review applies as well to the district court's predicate findings of fact underlying its ultimate finding as to a defendant's propensity to flee. *Berrios-Berrios, supra,* 791 F.2d at 250.

With regard to the standard of review to be applied to a determination by the district court as to the existence of conditions to assure a defendant's presence at trial, panels of this Court recently have made what

at first glance might appear to be conflicting statements, but which upon careful analysis are not in conflict at all. In *Martir, supra,* 782 F.2d 1141, we rejected an invitation "independently [to] determine whether a conditional release would reasonably assure his presence at trial." *Id.* at 1146. We held that it was "established in this circuit that we should reverse only if the district court's finding on this issue was clearly erroneous." *Id.* (citing *United States v. Colombo,* 777 F.2d 96, 100 (2 Cir.1985); *Chimurenga, supra,* 760 F.2d at 405).

In *Melendez-Carrion, supra,* 790 F.2d 984, we reaffirmed the general rule that the clearly erroneous standard applies "with respect to the ascertainment of historical facts underlying the conclusion that the defendant is a risk to flee". 790 F.2d at 994. We recognized, however, that "[a]ny error in the application of the pertinent legal standard is of course subject to broader review." *Id.* In commenting on this principle in *Berrios-Berrios, supra,* we stated:

"Berrios argues that, even if the district court did not clearly err in finding that she posed a risk of flight, the court nevertheless erred by failing to consider fully and explicitly whether the government had shown that no condition or combination of conditions would 'reasonably assure' her presence at trial if she were released.... Berrios points out that the district court's obligation to consider all possible alternatives to preventive detention derives from the historical view that bail may be denied only in a 'rare case of extreme and unusual circumstances,' [*United States v. Abrahams,* 575 F.2d 3, 8 (1 Cir.), *cert. denied,* 439 U.S. 821 (1978)], and that the presumption in favor of bail still applies where the defendant is found to be a risk of flight.... Because these legal and policy standards were explicitly incorporated into the [Act] ... *the court's determination of the viability of alternatives to detention must be, in every case, a mixed question of fact and law. Such questions are subject to flexible*

appellate review. See [Melendez-Carrion, supra, 790 F.2d at 994–95]." Berrios-Berrios, supra, 791 F.2d at 251 (emphasis added).

Later in Gotti, supra, 794 F.2d 773, we stated that "[i]n a number of recent cases construing the [Act] we have made clear that in reviewing detention and release orders, the clearly erroneous standard applies." Gotti, supra, 794 F.2d at 778 (citing Melendez-Carrion, supra, 790 F.2d at 994; Martir, supra, 782 F.2d at 1146–47; Colombo, supra, 777 F.2d at 100; Chimurenga, supra, 760 F.2d at 405). The Gotti panel stated in a footnote:

> "We realize that a divided panel of this court has very recently used language supporting broader appellate review, in the context of whether conditions of release would prevent a defendant's flight before trial. [Berrios-Berrios, supra, 791 F.2d at 250–51]. It is difficult to square that language with our previous decisions, supra. In addition, the language concerning scope of review was not strictly necessary to the decision in that case. The Berrios-Berrios panel remanded so that the district court could articulate its reasons for concluding that no conditions of release would assure the defendant's presence. Whatever the standard of appellate review, it is clear that the panel there believed that elaboration by the lower court was necessary for any meaningful review at all."

Gotti, supra, 794 F.2d at 778 n. 4. See also United States v. Claudio, 806 F.2d 334, 338 (2 Cir.1986) ("In this Circuit it is settled that a District Court's determination that grounds exist to detain a defendant prior to trial will be reviewed under the 'clearly erroneous' standard.").

We believe that our statements in the above cases are not inherently inconsistent. Rather, taken together, the cases should be read to establish guidelines for consistent review of district court determinations on whether "conditions or [a] combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e). These guidelines not only are based on the cases referred to above, but also find support in well recognized general principles of review applicable to a wide range of cases.

■ Whether there are conditions or a combination of conditions which reasonably will assure the appearance of the defendant at trial is a mixed question of law and fact. Berrios-Berrios, supra, 791 F.2d at 251; see Melendez-Carrion, supra, 790 F.2d at 994.

It is in part a question of fact since the ultimate finding of the existence of such conditions properly can be reached only after consideration of the factors set forth in 18 U.S.C. § 3142(g). In most instances, those factors involve purely factual determinations.

It is in part a question of law since Congress' use in the statute of the word "reasonably" makes the existence of "conditions" under 18 U.S.C. § 3142(e) in part a question of law. A determination by a district court as to whether an act is "reasonable" usually is considered to be a legal conclusion. See United States v. Ceballos, 812 F.2d 42, 46–47 (2 Cir.1987); see also Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774, 776–78 (2 Cir.) (Friendly, J.), cert. denied, 385 U.S. 835 (1966). Nevertheles, in the ordinary case, we will review under the clearly erroneous rule the district court's ultimate determination as to the existence of conditions. See Gotti, supra, 794 F.2d at 778; Martir, supra, 782 F.2d at 1146–47. Although the issue whether conditions will "reasonably assure" the defendant's presence involves application of a legal standard, proper resolution of that issue depends in large part on the district court's predicate findings as to the factors set forth in 18 U.S.C. § 3142(g). Determining the weight to be accorded to each factor in reaching the ultimate finding as to the existence of conditions "is the special province of the trier of fact." Inwood Laboratories v. Ives Laboratories, 456 U.S. 844, 856 (1982).

■ The clearly erroneous standard does not apply to the district court's ultimate finding, however, if the court has made an error of law. Melendez-Carrion, supra,

790 F.2d at 994. This rule rests on the well established principle that " 'if an error of law has impaired the judgment of the trial court on a mixed question of law or fact', the finding should be set aside." *Karavos Compania Naviera S.A. v. Atlantica Export Corporation,* 588 F.2d 1, 8 (2 Cir. 1978) (Friendly, J.) (quoting 9 Wright & Miller, Federal Practice and Procedure § 2589, at 755–56). *See also United States v. United States Gypsum Co., supra,* 333 U.S. at 394. If, for example, the court does not consider the factors set forth in 18 U.S.C. § 3142(g) in reaching its ultimate finding on the existence or nonexistence of conditions, the finding will be subject to more flexible review. *E.g., Berrios-Berrios, supra,* 791 F.2d at 252 ("court's failure to explain on the record the extent to which it considered any alternative to incarceration" required remand).

Similarly, we may weigh the evidence ourselves if the district court considers those factors but nevertheless in reaching its ultimate finding relies primarily on some factor or factors not set forth by Congress in § 3142(g). In weighing the evidence, of course, we will accord appropriate deference to those of the court's historical findings which are not affected by its errors of law.

Finally, the court's ultimate finding may be subject to plenary review if it rests on a predicate finding which reflects a misperception of a legal rule applicable to the particular factor involved. That is, even if the court's finding of an historical fact relevant to that factor is not clearly erroneous, we may reverse if the court evinces a misunderstanding of the legal significance of that historical fact and if that misunderstanding infects the court's ultimate finding. *See Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 501 (1984) ("Rule 52(a) does not inhibit an appellate court's power to correct errors of law, including those that may infect a so-called mixed finding of law and fact, or a finding of fact that is predicated on a misunderstanding of the governing rule of law.").

Applying the foregoing principles with respect to the scope of our review, we turn to the findings of the district court in the instant case.

B. *Review of the District Court's Findings.*

As we have observed, the district court found that the government had failed to prove by a preponderance of the evidence that no condition or combination of conditions would reasonably assure the presence of Shakur at trial. The court reached that ultimate finding after considering the factors set forth in § 3142(g) as well as other factors believed by the court to be important.

As for the first factor of § 3142(g)—"the nature and circumstances of the offense charged"—the court found, and we agree, that "the crimes charged in the indictment are very serious." This finding is inescapable in light of the numerous crimes of violence against law enforcement officers and others with which Shakur is charged, the sophisticated weaponry which he is charged with having used in the commission of those crimes, and the sentence Shakur faces if convicted.

The second factor of § 3142(g)—"the weight of the evidence against the person"—required the district court to consider evidence proffered by the government which it intends to use at Shakur's trial. The government proffered "what it expects the substance of its case against Shakur to be, at least in part", in an affidavit submitted on October 29, 1986. According to that affidavit, the government intends to present evidence that the crimes charged in the indictment were committed by a criminal enterprise known as the "family". Shakur is said to have been a founder of the family and one of its five "core" members. The government intends to show that the family was divided into two "teams". The "primary team", consisting of Shakur and the other four core members of the family, is charged with having actually committed the robberies, murders, and prison escape. The "secondary team" is comprised of persons who provided support

to the primary team by performing reconnaissance, renting safehouses, procuring false identifications, and renting and driving vehicles used in the crimes. As part of his duties as a member of the primary team, Shakur is charged with having conducted "training" and planning sessions leading to the actual commission of the crimes by Shakur and the other members of the primary team. Much of the government's evidence will be through informants.

Physical evidence will include, among other things, Shakur's fingerprints on hand drawn maps of robbery sites and financial ledgers of the family showing withdrawals by Shakur. The government also intends to introduce a tape-recorded telephone conversation between Shakur and a co-conspirator. According to a transcript prepared by the government, Shakur referred to his participation in the Brinks robbery during the conversation:

"I thought those guys would move. Weems he was to go back with Elizabeth but Elizabeth was fucked up. And I'm about, I, I, I almost got in front of you as the cop shot with the shotgun.... We had to do it. I mean, I mean, that cop moved. Boom. You know what I'm sayin'? (Laughs) Cause they all seen us when we got out, out of there. They don't have enough evidence. They have, They have no witness."

The district court found that "the Government's proof against Shakur can hardly be regarded as open and shut.... Shakur, presumptively innocent and with no prior criminal record, would appear to have some prospect of acquittal." This finding was based principally on two grounds. First, according to the court, the tape of the phone conversation appeared to be of poor quality, as a result of which the court believed that "[t]he jury could hear what the Government hears, but it could also fail to do so." Second, the court found it significant that much of the evidence based on the testimony of informants had been introduced by the government at a previous trial against Shakur's co-conspirators, some of whom were acquitted. *Ferguson, supra*, 758 F.2d 843.

Regarding the third factor of § 3142(g)—"the history and characteristics of the person"—the court stated that Shakur's lengthy period as a fugitive "counts against him unless satisfactorily explained". The court further stated, however, that it could not "characterize as inherently implausible Shakur's statement that after the Brinks incident, he was 'legitimately cautious, concerned and fearful' of the commission of criminal acts against him 'under a pretext of arrest.'" The court discounted Shakur's failure to surrender after his initial flight. Crediting Shakur's testimony at the evidentiary hearing, the court found that, despite Shakur's failure to surrender, "his role in the community and the importance of his work ... militates against flight." The court also found Shakur's numerous challenges to the court's jurisdiction to be insignificant: "I estimate no present view on the question. But Shakur is entitled to challenge the Court's jurisdiction; and I do not equate that entitlement or intent with a likelihood of flight if Shakur is released on bail and the jurisdictional motion denied."

After considering the nature of the property to be pledged if Shakur were released, the court discussed Shakur's testimony at the evidentiary hearing. The court stated that, based on Shakur's demeanor, it believed that Shakur would not flee if released on bail. The court recognized, however, that "Shakur was evidently quite prepared to lead a life of exile after March 1982, and would undoubtedly be doing so still if he had not been arrested." Finding that to be "a troubling circumstance", the court nevertheless did not "regard it as decisive" in "the totality of the circumstances".

### C. *Errors Believed To Have Been Committed By The District Court.*

 For the reasons stated below, we hold that the district court erred in reaching its ultimate finding that the government failed to prove that no conditions or combination of conditions would reasonably assure the presence of Shakur at trial.

That finding rests on a series of legal errors and clearly erroneous findings of fact.

First, the court committed both factual and legal errors in determining that there was a plausible explanation for Shakur's lengthy period as a fugitive.

We have held that a defendant's history of flight must be given careful consideration in determining whether bail should be granted. *Claudio, supra,* 806 F.2d at 343. That history is particularly important here. Shakur's flight was not some incident remote in time and unrelated to the matter at hand. Rather, his flight was precisely to avoid the charges now pending against him. Shakur presumably has the same motive to flee if released on bail now as he had when he became a fugitive in 1982: to avoid "being convicted of serious pending charges and receiving significant punishment." *Claudio, supra,* 806 F.2d at 338. As the district court here recognized, Shakur would still be "lead[ing] a life of exile" had he not—in Shakur's words—been "captured". Moreover, Shakur has demonstrated great skill in avoiding arrest for those very charges. Although on the FBI's list of the ten most wanted fugitives, Shakur was able to evade law enforcement authorities through the use of fictitious names and by moving from city to city. There is no reason to believe that Shakur's evasion skills have diminished since his incarceration in February 1986.

Even assuming that Shakur's asserted explanation for his *original* flight was not—in the words of the district court—"inherently implausible", that explanation was insufficient as a matter of law to justify his *subsequent* failure to surrender. In *United States v. Bailey,* 444 U.S. 394, 415 (1980), the Supreme Court held that a defendant to an escape charge cannot meet the minimum standard for submitting the affirmative defense of duress or necessity to a jury unless the defendant proffers evidence of a bona fide effort to surrender as soon as the claimed duress or necessity ceased. The district court in the instant case sought to distinguish *Bailey* on the ground that it involved a prosecution for past escape. In our view, however, the

*Bailey* Court's burden of production holding is directly relevant to whether the district court properly considered Shakur's explanation for his flight plausible. We hold that Shakur's failure to arrange, with the assistance and protection of a court or counsel, to surrender at any time between his flight in March 1982 and his arrest in February 1986 renders his explanation implausible as a matter of law.

The district court also committed a factual error in its assessment of the likelihood that Shakur would be convicted. That error resulted from a misperception of the results of the trial leading to our opinion in *Ferguson, supra,* 758 F.2d 843. True, that trial resulted in some acquittals. The only defendant, like Shakur here, who was charged with having been one of the five "core" family members, was convicted on substantive and conspiracy RICO counts. 758 F.2d at 847. That defendant—Sekou Odinga—was sentenced to an aggregate prison term of 40 years and was fined $50,000. *Id.* at 848. Moreover, although certain members of the family's "secondary team" were acquitted on more serious charges, they were convicted of being accessories after the fact to a robbery for "[their] activities ... in connection with Mutulu Shakur." *Id.* at 851 n. 2. We hold that the district court here erred in its attempt to minimize the likelihood that Shakur will be convicted in the instant case.

The district court also was clearly erroneous in discounting Shakur's numerous challenges to the court's jurisdiction. A challenge to jurisdiction of course is not in and of itself a ground to deny bail. Such a challenge, when made in a proper motion, should be interpreted to constitute nothing more than a respectful assertion of lawful rights. Circumstances in the instant case, however, render untenable the district court's refusal to equate Shakur's challenge to "a likelihood of flight".

Shakur's challenge is frivolous, as his attorney surely knows. *Ferguson, supra,* 758 F.2d at 846–47 & n. 1 (rejecting as without merit Odinga's claim that "the district court did not have jurisdiction over him because he was a political prisoner-of-

war"); *United States v. Lumumba*, 741 F.2d 12, 15 (2 Cir.1984) (rejecting claim of Shakur's present counsel that the district court was without jurisdiction to hold him in criminal contempt because he was " 'Vice President and Minister of Justice of the Provisional Government of the Republic of New Afrika' "), *cert. denied* 107 S.Ct. 192 (1986). When the frivolousness of Shakur's challenge is considered in light of the manner in which on numerous occasions he has made that challenge, it becomes all too apparent that Shakur will subject himself to the court's jurisdiction only if, at the time of trial, it is *still* "in [his] strategy" to do so. From his first appearance before the district court—during which he conveyed greetings from a fellow fugitive—until the evidentiary hearing on the instant application—where he testified that since "the court [was] one of [the FBI's] tools to harass ... the movement", the movement need not comply with grand jury subpoenaes—Shakur has displayed nothing but defiance of the court's power to try him unless he chooses to be tried. We hold that the district court committed clear error in discounting Shakur's challenge to the court's jurisdiction.

Finally, we hold that the district court erred as a matter of law in placing primary reliance on its assessment of Shakur's demeanor. It is clear from what we have stated above that the court relied almost exclusively on Shakur's testimony to discount his history of flight and defiance of the court. In the Act, however, Congress requires the court to consider the defendant's history and characteristics, as well as other factors, in determining whether conditions can be imposed that reasonably will assure the defendant's presence at trial. We recognize that an assessment of demeanor often may be a helpful aid to the court in reaching its ultimate finding on this issue. In a case such as the instant one, however, where the factors enunciated by Congress compel the conclusion that the defendant should be detained, the court may not second guess Congress by relying almost exclusively on an extrastatutory inquiry.

This principle is particularly applicable here because the court's assessment of Shakur's demeanor was made in the absence of cross examination by the government. *Cf. Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (absence of cross examination "calls into question the ultimate ' "integrity of the fact-finding process" ' ") (quoting *Berger v. California*, 393 U.S. 314, 315 (1969)). While the court did not err in prohibiting cross examination—thereby protecting Shakur's privilege against self-incrimination—the court did err in relying so heavily on a fact-finding procedure of limited utility to the exclusion of the factors prescribed by Congress.

The district court erred in its ultimate finding on the existence of conditions to assure Shakur's presence. That finding is infected by its clearly erroneous findings of fact regarding Shakur's explanation for his long period as a fugitive, the likelihood that he will be convicted, and his defiance of the court's jurisdiction. The court's ultimate finding also rests on legal errors. First, Shakur's explanation for his period as a fugitive is implausible as a matter of law since he never took steps to surrender. The district court therefore misperceived the legal significance of the historical fact of Shakur's period as a fugitive. Second, the court erred in relying almost exclusively on its assessment of Shakur's demeanor to the exclusion of the factors prescribed by Congress in § 3142(g).

When considered in light of a proper factual and legal analysis, the record makes clear that Shakur poses a serious—probably inevitable—risk of flight and that no condition or combination of conditions could be imposed which reasonably would assure his presence at trial. In light of the nature of the crimes with which Shakur is charged, the likelihood that he will be convicted, and his history and characteristics, we disagree with the district court that the pledging by his political supporters of their homes will dissuade Shakur's flight. Indeed, it is more likely that those supporters would seek to obtain his freedom through flight by any means necessary, including the loss of their homes. Moreover, we disagree with the district court that those

conditions of bail which would have required Shakur to maintain daily contact with the government would prevent flight. In a case such as this, such conditions "may serve as inconveniences", *Colombo, supra*, 777 F.2d at 100, but their principal effect would be simply to alert the court after Shakur had fled.

We hold that the government has sustained its burden under § 3142(e). The district court erred when it found that conditions could be imposed which reasonably would assure the presence of Shakur at trial. That finding rests on errors of law as well as on clearly erroneous findings of fact.

### III.

To summarize:

Whether there are conditions which reasonably will assure the presence of a defendant at trial is a mixed question of law and fact. Ordinarily we will review a district court's finding on that question under the clearly erroneous standard. Where, however, a district court makes errors of law which infect its ultimate finding, we will engage in a more flexible review.

In the instant case, many of the district court's predicate findings of fact with respect to the factors set forth in 18 U.S.C. § 3142(g) were either clearly erroneous or based on misperceptions of the legal significance of historical facts. Those factual and legal errors render erroneous the court's ultimate finding that the government failed to sustain its burden under 18 U.S.C. § 3142(e). When considered in light of a proper factual and legal analysis, the record is clear that Shakur poses a serious—probably inevitable—risk of flight and that no condition or combination of conditions will prevent that flight.

We hold that the district court erred in finding that conditions could be imposed which reasonably would assure the presence of Shakur at trial. That finding rests on errors of law as well as on clearly erroneous findings of fact.

Reversed.