**UNITED STATES of America,**

v.

**William Price TROLINGER, III, Defendant.**

**No. 97–CR–193A.**

United States District Court, W.D. New York.

Dec. 10, 1999.

James P. Kennedy, Jr., U.S. Atty., Buffalo, NY, for U.S.

Mark J. Mahoney, Law Office of Mark J. Mahoney, Buffalo, NY, for William Price Trolinger, III aka Concho aka Joseph Allen Drier aka William Anthony Rollins aka Patrick William Connors aka Robert William Miller aka Francesco Simeone, defendants.

## DECISION AND ORDER

ARCARA, District Judge.

### *INTRODUCTION*

On October 29, 1997, a federal grand jury returned a twelve-count Superseding Indictment charging defendant William Price Trolinger, III, and nine others with various offenses under the Controlled Substances Act. Defendant Trolinger is charged as follows: in Count I, with engaging in a Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848(a) and (b); in Count VI, with unlawfully exporting 100 kilograms or more of marijuana, in the form of hashish, in violation of 21 U.S.C. §§ 953(c), 960(a) and 960(b)(2)(G) and 18 U.S.C. § 2; in Count VII, with unlawfully importing 50 kilograms or more of marijuana, in the form of hashish, in violation of 21 U.S.C. §§ 952(a), 960(a) and 960(b)(3) and 18 U.S.C. § 2; in Count IX, with unlawfully possessing with intent to distribute and distributing 100 kilograms or more of marijuana, in the form of hashish, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B) and 18 U.S.C. § 2; in Count X, with conspiracy to export from the United States, and to import into the United States, 1000 kilograms or more of marijuana, in the form of hashish, in violation of 21 U.S.C. § 963; and in Count XI, with conspiracy to possess with intent to distribute and to distribute 1000 kilograms or more of marijuana, in the form of hashish, in violation of 21 U.S.C. § 846.

Upon the return of the Superseding Indictment, on October 29, 1997, an arrest warrant was issued for defendant. On or about December 21, 1998, defendant was arrested in Toronto, Canada.

During the pendency of the extradition process from Canada to the United States, defendant appeared on April 28, 1999 for a bail hearing before the Honorable Justice Locke of the Ontario Superior Court of Justice, Toronto Region. On April 30, 1999, following that hearing, Justice Locke rendered a decision denying defendant's request for bail pending his extradition to the United States. Defendant ultimately consented to extradition.

On October 8, 1999, following extradition, defendant appeared before the Honorable Hugh B. Scott, United States Magistrate Judge, for an initial appearance and arraignment. At that time, the government moved for a detention order pursu-

ant to 18 U.S.C. § 3142(f)(1)(C), arguing that defendant poses both a danger to the safety of the community and a risk of flight. The Pretrial Services Office also submitted a written report recommending that defendant be detained pending trial. At the request of defendant's counsel, Magistrate Judge Scott adjourned the detention hearing until October 14, 1999.

The detention hearing was held on October 14, 1999 and both the government and the defendant proceeded by way of proffer. Following the hearing, Magistrate Judge Scott reserved decision.

On October 20, 1999, Magistrate Judge Scott denied the government's detention motion and issued a release order, setting bail in the amount of $1 million, fully secured by property, assets, or cash. Magistrate Judge Scott further imposed home confinement and electronic monitoring, presumably at the defendant's mother's residence in the District of Maryland. As further conditions of release, Magistrate Judge Scott imposed a travel restriction on defendant, required him to surrender his passport, and imposed various other conditions.

On October 26, 1999, counsel appeared for a status conference before Magistrate Judge Scott. Defense counsel informed Magistrate Judge Scott that bail could not yet be posted. Magistrate Judge Scott therefore remanded defendant to custody.

On October 27, 1999, the government moved this Court for an order, pursuant to 18 U.S.C. § 3145(a)(1), revoking Magistrate Judge Scott's October 20, 1999 release order, arguing that defendant presents a risk of flight.[1] The Court thereafter scheduled a *de novo* hearing on the government's motion for November 23, 1999.

On November 15, 1999, the parties met with Magistrate Judge Scott for a status conference. It appears that, at that time, defendant was able to post bail, but Magistrate Judge Scott ordered defendant remanded pending this Court's decision on the government's revocation motion.

On November 22, 1999, defendant filed a written opposition to the government's revocation motion, along with an appendix of exhibits.

On November 23 and 24, 1999, the Court held a hearing on the government's revocation motion. At the hearing, the government again proceeded by way of proffer. Defendant too made a proffer, but also presented three witnesses: the defendant, his mother and his daughter. A transcript of the detention hearing held before Magistrate Judge Scott on October 16, 1999 was also filed and made available for the Court's review.

After considering the evidence adduced at the hearing, reviewing the submissions of the parties, and hearing argument from counsel, the Court finds, pursuant to 18 U.S.C. § 3142, that no condition or combination of conditions will reasonably assure defendant's appearance as required for further proceedings. Accordingly, the Court revokes Magistrate Judge Scott's October 20, 1999 release order and orders that defendant be detained pending trial.

### FINDINGS OF FACT

The Court makes these findings of fact based on the evidence presented by way of proffer and testimony at the hearings before Magistrate Judge Scott and this Court.[2]

### A. *Background and Nature and Circumstances of Charged Conduct*

The government summarized the background facts and the facts underlying the

---

1. Although the government also argued before Magistrate Judge Scott that defendant should be detained in order to assure the safety of the community, it is not asserting that ground for detention before this Court.

2. Defendant objects to the government proceeding by way of proffer. The Court finds this objection to be without merit. *See United States v. Martir,* 782 F.2d 1141, 1145 (2d Cir.1986).

charges set forth in the Superseding Indictment by relying upon the affidavits of the Drug Enforcement Agency case agent Special Agent Alexander F. Smith, Jr., *see* Government Exhibit 2, and an unindicted coconspirator and longtime associate of defendant named William Troy. *See* Government Exhibit 5. Both of these affidavits were also submitted in support of the government's request for extradition of defendant from Canada.

According to these affidavits, in 1978, defendant and William Troy formed a partnership with a marijuana distributor named Breiding, who had purchased a 70–foot sailboat named the "Pleamar." Troy flew to Columbia to pick-out marijuana that was to be imported into the United States, and eventually met with the crew of the Pleamar off the coast of Columbia, where the marijuana was transferred onto the Pleamar. Defendant's role in this transaction was to arrange (rent the properties) for the off-load site in the Chesapeake Bay area. Eventually, approximately 10,000 pounds of marijuana was off-loaded in Chincoteague Island, Virginia, while approximately 5,000 to 6,000 pounds was unloaded in Easton, Maryland, farther up the Chesapeake Bay. Approximately two weeks before off-loading, Breiding was arrested in Ocean City, Maryland. At the time of his arrest, he was in possession of money, marijuana and maps to the properties. Consequently, Troy and others were arrested in Chincoteague Island, while defendant and others were arrested in Easton, Maryland. Charges against all of the defendants were ultimately dismissed based upon a faulty search.[3]

In about 1979 into 1980, defendant and Troy traveled to France and purchased a 65–foot sailboat named the "Aldabaran." Defendant, Troy, co-defendant Christopher Joseph Ecker and others refurbished the boat in the South of France. Following the refurbishing, the boat was sailed to

Greece, and Troy and Ecker flew back to the United States from Greece. Defendant and an individual named Timothy Hansen sailed the boat to Lebanon where they met "Jeffery LNU" who loaded approximately 12,000 pounds of hashish onto the Aldabaran. Defendant then sailed the Aldabaran to St. Barthelemy in the French West Indies where Troy met the boat. In St. Barthelemy, defendant got off the boat and Troy got on. Troy then sailed the boat to South Carolina, where the hashish was off-loaded. Defendant and others then distributed the hashish in the United States. Defendant and Troy made approximately $300,000 each on this importation.

In about 1983 to 1984, defendant formulated a plan to import marijuana from Thailand. In 1984, defendant contacted Troy and asked him to go to Northern Oregon/Southern Washington in order to assist in the off-loading of a boat loaded with marijuana from Thailand. Troy and codefendant Wesley Dean Lundy then flew to San Francisco and drove up to Astoria, Washington. In Astoria, Troy and Lundy met with defendant. The Thai marijuana was then sailed into the Oregon coast aboard the Aldabaran, by "Randy LNU," Rob Trolinger (defendant's brother), Jimmy Phelps, and others. Another individual named "Thunder," who appeared to Troy to have worked out some sort of a partnership with defendant, was also present. Approximately 10,000 pounds of marijuana was imported and eventually loaded into trucks and driven east. Defendant was responsible for distribution of this marijuana. Based on his knowledge of the drug business and his discussions with defendant, Troy estimates that defendant made between $1 million and $2 million from this load of Thai marijuana.

After this successful marijuana importation, defendant became involved in the off-loading of approximately 40,000 pounds of

---

**3.** This conduct is not charged in the Superceding Indictment but is provided simply for background.

hashish at the same off-load site as had been previously used for the Thai marijuana. Troy states that he knows, based on discussions with defendant and others involved in this shipment, that defendant made approximately $4 million from this load of hashish.

Thereafter, in about December of 1992, an individual named Constantine Szejko offered Troy a quantity of hashish from Pakistan which was to be supplied, at least in part, by Lundy. Troy, knowing that defendant would have outlets for the hashish, decided to contact defendant via his voice mail in San Francisco. During a conversation with defendant, Troy learned that defendant's outlets were in the Toronto, Ontario area.

Following Troy's conversation with defendant, Troy and Szejko finalized plans to transport hashish to the Buffalo, New York area for ultimate distribution into Canada. It was necessary for both Troy and Szejko to act as middlemen in this deal because Lundy, who was providing the hashish to Szejko, and defendant had previously had a falling-out and did not get along with one another.

Ultimately, the hashish was delivered to Westchester County, New York. On January 25, 1993, Troy flew from Florida to Washington, D.C., where he was picked-up by defendant. Troy and defendant then drove in defendant's vehicle from Washington to a hotel in Tarrytown, New York, where they met Szejko. Defendant's vehicle was then loaded with approximately 348 pounds of hashish packed in cardboard boxes. Troy and defendant then drove to the Niagara Falls, New York area, and along the way, defendant made several calls to his Canadian contacts. Once in Niagara Falls, defendant and Troy met with co-defendant Bruce DeBarros at a restaurant in Niagara Falls. DeBarros was the liaison for co-defendant Karl Drysdale, who was defendant's contact in Toronto. During the meeting, it was decided that the hashish would be transported to a stash house located in nearby Youngstown, New York.

Once at the stash house, the hashish was removed from the cardboard boxes so that the quality of the hashish could be inspected. At that time, DeBarros complained to defendant about the poor quality of the hashish. DeBarros and defendant also discussed the arrangements for getting the hashish to Drysdale in Canada. DeBarros stated that he and codefendant Cecil Patrick Manningham were going to transport the hashish across the Rainbow Bridge between Niagara Falls, New York and Niagara Falls, Ontario.

On January 29, 1993, defendant and Troy checked into a hotel on Grand Island, New York to await payment from Drysdale. Defendant and Troy needed the proceeds from the sale of the first hashish load as quickly as possible so that they could pay for a second load of approximately 310 pounds of hashish that was already being transported to the Buffalo area by Lundy and another individual, codefendant Harry Carter Russell.

At the hotel on Grand Island, Troy was using the alias of Raymond Maxwell and defendant was using the alias Robert Miller. At the same time, Szejko, at the direction of Lundy, was staying at a hotel in Buffalo to coordinate the distribution of the hashish and the collection of proceeds from the Canadian customers. After arriving with the second load of hashish, Lundy and Carter stayed at a hotel located south of Buffalo.

Because the Canadian customers were dissatisfied with the quality of the hashish, payment was slow in coming. After four or five days of the first load of hashish being taken to Canada, defendant and Troy finally received payment of about $150,000. Of this money, both Troy and defendant took about $5,000 each, while Szejko took about $25,000. Lundy received the rest.

The second load of hashish was contained in Russell's mother's car. Szejko

delivered the vehicle to Troy and defendant and the two of them drove the car to the stash house in Youngstown, where the hashish was unloaded. The second load was of the same poor quality as the first.

On February 12, 1993, defendant and Troy were again staying at the same hotel on Grand Island when defendant received a telephone call informing him that approximately ten kilograms of hashish and $130,000 had been seized from "Bruce" and "Karl" in Toronto. After receiving this call, Troy and defendant relocated to a hotel near the Buffalo Airport.

According to the government, information provided by the Royal Canadian Mounted Police ("RCMP") confirms that as part of an undercover investigation, the RCMP, during early February 1993, arrested three individuals, co-defendants Karl Drysdale, Bruce Hahn, and Radomir Pajkovic, in Toronto and seized twelve kilograms of hashish and $130,000 (U.S.).

As money was slow in coming back from Canada, Lundy and Russell grew increasingly impatient. At about the same time as the arrests in Canada, they began to complain and indicated that they had another outlet, subsequently identified as Michael Pate, who was having better success in distributing the hashish. They advised Szejko that the hashish was coming from the West Coast and that tens of thousands of pounds of hashish were available. Lundy and Russell relocated to a rental house located in Ellicottville, New York, and began distributing their hashish through Pate.

In sum, Drysdale and his associates made payments to defendant and Troy totaling approximately $255,000. In addition, approximately $250,000 worth of infe-

rior quality hashish was returned from Canada to Lundy and Russell, who, in turn, distributed it in Maryland and elsewhere through co-defendant Ecker and others.[4]

The government has proffered that it has hotel records which corroborate the information provided by Troy and others. In addition, the government states that numerous cooperating coconspirators, including William Troy, Constantine Szejko, James Phelps and Robert Michael Pate, have testified before the grand jury in this case.

### B. *Defendant's More Recent Conduct*

The government has also proffered information regarding defendant's more recent drug trafficking activities. These activities allegedly occurred between 1996 and 1998, after the time of the conduct charged, in the Superseding Indictment.[5]

The government's proffer consists primarily of a summary of the results of Special Agent Smith's debriefings of an individual identified as Wayne Douglas Stork. *See* Government Exhibit 12. As indicated in the government's proffer, Stork, since 1996, had been personally responsible for providing defendant and co-defendant Drysdale with millions of dollars worth of marijuana. During the course of that conspiracy between defendant, Stork, Drysdale and others, Stork learned that defendant, in late 1997 and early 1998, arranged for the importation of 22,000 pounds of hashish from Afghanistan to Canada. Such importation was accomplished using the sailing vessel "Lady Francesca."Stork indicated that the value of the hashish in this successful importa-

---

4. In addition to the returned hashish, Lundy also arranged to obtain additional quantities of the same load of hashish from the West Coast. Specifically, towards the end of March of 1993, two individuals from the Baltimore, Maryland area, at the request of Lundy, drove to San Francisco and picked-up 1,200 pounds of hashish, which was subsequently delivered to the East Coast.

5. The Court notes that the government has presented no proof that defendant was aware of the existence of indictment in the instant case prior to his arrest on or about December 21, 1998.

tion, for which defendant was principally responsible, was between $35 million and $55 million (Canadian).

Several items found on defendant's person when he was arrested provide additional evidence that he was involved in drug activity right up until the time of his arrest. These items included two cellular telephones (neither of which was in defendant's name), several forms of false identification, including a false birth certificate, false driver's license and false business cards, hundreds of dollars worth of prepaid calling cards and $11,000 (Canadian) in a brown paper bag. *See* Government Exhibits 6, 7, 8, 17, 18 and 19; Item 98 at 46. Additionally, at the time of his arrest, defendant had in his possession an address book, which contains what appears to be a telephone number for, or at least a reference to, the sailing vessel Lady Francesca, the same vessel which Stork claims was used to smuggle millions of dollars worth of hashish into Canada. *See* Government Exhibit 17.

### C. *Canadian Bail Hearing*

As part of its proffer, the government also presented the transcript of the April 28, 1999, Canadian court proceeding concerning defendant's request for bail pending his extradition to the United States. *See* Government Exhibit 3.

At the Canadian bail proceeding, defendant's daughter, Morgan Trolinger, testified that her father was never around very much and was always away on business trips. She testified that she would see her father for a couple of hours and then he would disappear. She stated that the defendant traveled extensively and "was never permanently there." *Id.* at 28. When asked where defendant lived, his daughter could respond only, "a hotel room—I'm not sure." *Id.* Ms. Trolinger had no way to contact her father, and instead had to rely

on him contacting her. As she stated, she "never knew where he was." *Id.* at 29.

Defendant also testified at the Canadian bail hearing. He admitted that he has not had a permanent residence or even country of residence since 1992. He stated, "I've been everywhere ... I've lived in a suitcase, basically, since 1992." *Id.* at 57.

Based on the transcript of the Canadian bail hearing, the Court finds that when defendant was asked by the Canadian prosecutor how he has made a living since 1983, defendant gave inconsistent, confusing and evasive testimony. He initially maintained that he has made his living as a film producer and in the gold mining business. When asked by the prosecutor on which films he has been given credit as a producer, he stated that he has never taken credit for his work "for tax reasons." [6] *Id.* at 60–61. He subsequently stated, however, that he has not made any money in the film business and that he did it "for fun," not for money. *Id.* at 61. He also admitted that he did not make any money from gold mining.

Defendant admitted to possessing at the time of his arrest, a false birth certificate in the name of Andrew William Rollins. He stated that he had created the birth certificate himself as a means of evading detection by the United States government. When asked to explain, he stated, "Well, actually, because I feel my government has not been very friendly towards me for many years, and so, I guess, I was not wanting to be William Trolinger ... I feel that my government has had a political vendetta against me for many years, and being me has not been a very happy thing ... They seem to accuse me of crimes that are, (a), in my opinion, not crimes, and, (b), things that I'm not guilty of ..." *Id.* at 62–63. When asked to explain what he meant by being accused of things that are not crimes, defendant re-

---

**6.** The government pointed out at the detention hearing before Magistrate Judge Scott that a check of Internal Revenue Service records and Revenue Canada records revealed that defendant has never paid taxes in either the United States or Canada. Item 84 at 20–21. Thus, defendant's explanation appears to be disingenuous.

sponded, "I refer to things such as the crime that I'm being accused of at this time ... I don't consider the hemp plant to be a crime ... I'm sorry not to be in tune with my government on that, my family has lived in the United States for three-hundred and fifty years, and that has been something that is a source of pain, that my government and I don't get along, but I feel that I will be vindicated on that opinion before too much longer." *Id.* at 63. Defendant admitted that he smokes marijuana and hashish.

Defendant also admitted that the business cards in his possession at the time of his arrest were false. The business cards were in the name of Rollins and identified him as a film producer. Defendant admitted that the film companies identified in the business cards were fictitious entities that he made up himself.[7]

Defendant admitted that in 1998, he had no employment and was not making any money. When asked about the $11,000 (Canadian) cash in his possession at the time of his arrest, defendant once again gave evasive testimony. He first stated that he had borrowed the money. But when asked who he had borrowed it from, he stated, "I'm not at liberty to say right now." *Id.* at 71–72. When pressed, he claimed that he borrowed the money from his mother originally, but that he had gotten this particular money from gold that he had sold.

Following the bail hearing, Justice Locke, on April 30, 1999, denied defendant's request for bail pending extradition. *See* Government's Exhibit 4. In rendering his decision, Justice Locke made the following observations:

Mr. Trolinger testified on his own behalf. I take from his evidence that for the past two decades or more at least, from the time his daughter Morgan was age four, Mr. Trolinger has lived essentially separate and apart from both his daughter and his wife. In addition, he frankly admitted to never having established even a home address sufficient to receive for any length of time telephone calls and mail, even on a semi-permanent basis. He acknowledged having lived continuously in many countries, mainly out of a suitcase and mainly in short term rental accommodations, including hotel rooms and the like. He could not produce an address where he had lived either by country, state, province or city.

He professed to having been a gold miner, but really could not say where or with what mine with any degree of accuracy or particularity. He stated that he helped produce movies. He named the movies, but he could not specify how he was paid, when he was paid, how much he was paid and who his employer really was.

On his arrest in December of 1998, at Toronto, he admitted that he carried on his person a false birth certificate by way of identification, in another name, and a driver's license in the same name, and also a number of business cards naming non-existent, fictitious corporations. His purpose, he said, was to employ those spurious documents to start a new life with his daughter in Canada, under the false name.

In essence, Mr. Trolinger projects a clear image of a fraudsman, a persuasive salesman, and a person capable to live well beyond the poverty line at any place of his choosing in the world.

The allegations are serious. As one factor only, the prosecution's case appears to be strong. . . .

On the primary grounds alone, I am not prepared to conclude that if released, even on substantial bail with strict terms and conditions, Mr. Trolinger would appear for his extradition hearing. . . .

His statement that he has had a running battle, at length, with the U.S. govern-

---

**7.** At the hearing before this Court, defendant changed his story and testified that some of the film companies on the business cards did in fact exist. Item 98 at 52–53.

ment on the subject of hemp (read marijuana) as an acceptable drug, and his determination to win that battle, leaves me with much concern that if released it is unlikely that he would appear to face the prospect of being returned to his home country....

*Id.* at 4–6.

### D. *Defendant's Criminal History and Use of Aliases*

At the hearing before this Court, the government presented a criminal history print-out indicating that in 1975, defendant was convicted in South Carolina of possession of marijuana with intent to distribute. *See* Government Exhibit 10. He was sentenced to five-years probation. The print-out also indicates that when defendant was arrested for drug-related activity on two other occasions, he used the false names Patrick William Connors and Joseph Allen Drier. Indeed, according to the government's proffer, when defendant was arrested in this case, he initially told the Canadian police that he was Andrew Rollins.[8]

As part of its proffer, the government also presented a print-out obtained from the United States Marshals Service, listing numerous aliases, false dates of birth, and false social security numbers previously used by defendant. *See* Government Exhibit 11. Among the aliases used by defendant was the name Bill Richards, which the government proffered was a name used by defendant in purchasing gold mining equipment valued at several hundred thousand dollars from a gold mining equipment manufacturer located in the State of Washington. The government further proffered, however, that defendant never bothered to take possession of the equipment.

The government also noted that defendant consistently used mail drops and voice mail services to communicate with others. He registered for these services using false names. For example, the government proffered that defendant used the names Bill Phillips and Mark Murray[9] to obtain a Mail Boxes, Etc. subscription, a post office box in San Francisco, and a voice mail box in Los Angeles, California.

Finally, as part of its proffer, the government presented a false United States passport application, submitted by defendant in August of 1983 in the name of Dennis Bryan Fleming. *See* Government Exhibit 9. Defendant utilized this application to obtain a fraudulent United States passport in Manilla, Philippines.

### E. *Evidence Proffered by Defendant*

Defendant has offered into evidence several affidavits from friends and family members stating that they are aware of the severity of the possible sentence that defendant faces, but are still willing to act as sureties for defendant's bail as they believe he will not flee. *See* Item 95, Exhibits A through H and M. He has also provided affidavits from other individuals, including lawyers who formerly represented him, who state that they have known him for some time and do not consider him a risk of flight. *See* Item 95, Exhibits G through K. Defendant's daughter has also supplied an affidavit regarding certain issues surrounding the alleged questioning of defendant's ex-wife and certain other allegations made by the government during its proffer before Magistrate Judge Scott. *See* Item 95, Exhibit L. Defendant has also supplied an aerial photograph and maps of Esquimalt Bay in British Columbia, Canada and certain information obtained from the Internet regarding the sailing vessel Lady Francesca. *See* Item 95, Exhibits N and O. These exhibits were provided in response to certain allegations

---

8. At the hearing before this Court, defendant denied under oath that he had given the Canadian police a false name when he was arrested. The Court found his testimony not credible.

9. At the hearing before this Court, defendant testified that the name he used was Mark Murphy rather than Mark Murray. Item 98 at 45.

made by the government regarding defendant's alleged connection to the Lady Francesca.

At the hearing before this Court, defendant also offered testimony from his daughter, his mother and himself. Defendant's daughter, Morgan Trolinger, testified about what she observed at the time of defendant's arrest in Canada. At the time of the arrest, she was walking down the street with defendant and did not hear or observe defendant giving the Canadian police a false name; she did not hear him give any name to the police. Ms. Trolinger also testified that she believes defendant will not flee if released on bail secured by his family and friends, because "he certainly wouldn't leave them in the lurch." Item 97 at 8. On cross-examination, Ms. Trolinger testified that defendant traveled extensively and that she never knew where he was, not even what country he was in. She also testified that she had no way of contacting defendant even if she had to. She stated that defendant has not had a specific residence since at least 1992.

Although Ms. Trolinger is only 18 years old, she did not come across as immature or naive. To the contrary, on cross-examination, she was often guarded and evasive in her answers.

Defendant's mother, Jane Trolinger, testified that she is willing to put up her house and other assets to secure defendant's bail, even though she would be left in a difficult position financially were he to flee. She is willing to do so because defendant is her son and because she believes he will not flee. She also testified that other family members are willing to be sureties for defendant's bail because, based on their knowledge of defendant, they too believe he will not flee. This is so even though they, like Mrs. Trolinger, would be left in a difficult position financially were defendant to flee.

Defendant also testified at the hearing. He testified that if released on bail, he would appear as required by the Court. He stated that when he was arrested on previous occasions, he was released on bail pending trial and always appeared as required, even though he faced substantial prison time in those cases if convicted. He stated that he would not flee in this case if released on the bail set by Magistrate Judge Scott because if he were to do so, his family would be left financially devastated. He also testified that his current incarceration in the Niagara County Jail is hindering him from assisting in his own defense. He complained that the law library there is inadequate and that he has difficulty communicating with his attorney.

On cross-examination, defendant admitted to a long history of making and using false identification, including false birth certificates, false driver's licenses, false business cards, false identification cards and a false passport. Defendant stated that it was not difficult for him to obtain or manufacture false identification, including false birth certificates which he could then use to obtain other forms of false identification. Defendant also admitted maintaining a voice mail box in California under a false name so that others could contact him.

Defendant further admitted during his testimony that at the time of his arrest, he was in possession of two cellular telephones, several forms of false identification, including a false birth certificate, false driver's license and false business cards, numerous pre-paid calling cards and $11,000 (Canadian) in a brown paper bag. He stated that the cellular phones were not in his name, but claimed that he could not remember what name they were in. He also admitted having in his possession at the time of his arrest an address book which contains the reference "Lady Fran." He admitted that "Lady Fran" refers to a boat.

Defendant testified that since 1992, he has lived out of a suitcase, traveling between the United States, Mexico and Canada, and has had no permanent residence anywhere. He further testified that since

1992, he has not had a steady job doing anything. He stated that he has not made much money from film production or gold mining and that in 1998, he had no paid employment at all.

After hearing defendant's testimony and observing his demeanor while testifying, the Court does not find him a wholly credible witness. His answers were often inconsistent, both with other testimony he gave in this Court and with his testimony before the Canadian court. He was often evasive and appeared to feign loss of memory about things that he clearly should have recalled.

### DISCUSSION

Under 18 U.S.C. § 3142(f)(1)(C), the government may move for pretrial detention of a defendant where the case involves "an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act (21 U.S.C. § 801 et seq.)[.]" In this case, as stated above, the government moved for detention of the defendant pending trial, pursuant to § 3142(f)(1)(C), but Magistrate Judge Scott denied the motion and ordered defendant released under certain conditions.

■ If a defendant is ordered released by a magistrate judge, the government may, under 18 U.S.C. § 3145(a)(1), move for revocation of the release order before the district court. Upon such motion, the district court must perform a *de novo* review of the magistrate judge's release order. *United States v. Leon,* 766 F.2d 77, 80 (2d Cir.1985) (finding that a district court should "not simply defer to the judgment of the magistrate, but reach its own independent conclusion"); *see also United States v. Colombo,* 777 F.2d 96, 100 (2d Cir.1985). When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence. *Colombo,* 777 F.2d at 98 n. 1; *Leon,* 766 F.2d at 80; *United States v. Delker,* 757 F.2d 1390, 1395-96 (3d Cir.

1985). Here, the government has moved this Court, pursuant to § 3145(a)(1), to revoke Magistrate Judge Scott's release order and to order defendant detained pending trial, arguing that defendant presents a risk of flight.

Where the issue involves a defendant's risk of flight, the Second Circuit has observed:

> The [Bail Reform Act of 1984] provides that a court should order a defendant detained pending trial if "no conditions or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e). We have interpreted § 3142(e) to require a district court to engage in a two step inquiry before ordering a defendant released or detained pending trial.

> First, the court must make a finding as to whether the defendant presents a risk of flight if not detained.

> Second, if the court finds that a defendant is likely to flee, then the court must proceed to the second step of the inquiry, namely, whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released. The burden of proof is on the government to prove the absence of such conditions by a preponderance of the evidence.

*United States v. Shakur,* 817 F.2d 189, 194-95 (2d Cir.) (case citations omitted), *cert. denied,* 484 U.S. 840, 108 S.Ct. 128, 98 L.Ed.2d 85 (1987).

■ Where an indictment charges a defendant with a narcotics offense for which the potential term of imprisonment is ten or more years, there is a rebuttable presumption that no condition or combination of conditions will reasonably assure the defendant's appearance as required. 18 U.S.C. § 3142(e); *United States v. Rodriguez,* 950 F.2d 85, 87 (2d Cir.1991); *United States v. Contreras,* 776 F.2d 51, 54-55 (2d Cir.1985). Thus, in cases such as this,

there is a rebuttable presumption that the defendant will not appear for trial.

■ Although the government retains the burden of persuasion on this issue, "a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *Rodriguez*, 950 F.2d at 88 (quoting *Martir*, 782 F.2d at 1144). "Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant." *Id.*

"Congress framed the flight presumption in light of its general finding, based on extensive testimony, that flight to avoid prosecution is 'particularly high among those charged with major drug offenses.'" *Martir*, 782 F.2d at 1144 (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 20, reprinted at 1984 U.S.C.C.A.N. 3203). Accordingly, the Second Circuit has stated that "it does not follow that the effect of the presumption disappears as soon as the defendant produces some contrary evidence." *Id.*

In determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required, the Court must consider the factors provided in 18 U.S.C. § 3142(g):

(1) The nature and circumstances of the offense charged, including whether the offense . . . involves a narcotic drug;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, crimi-

nal history, and record concerning appearance at court proceedings[.]

The Second Circuit has warned that, in applying these factors to any particular case, "the court should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *Shakur*, 817 F.2d at 195 (quoting S.Rep. No. 225, 98th Cong., 2nd Sess. 7, reprinted at 1984 U.S.C.C.A.N. 3182, 3189).

■ Applying the above principles in the instant case, the Court finds that defendant should be detained. First, the Court notes that in this case, the presumption of 18 U.S.C. § 3142(e) is in effect, which operates as a presumption that defendant will flee if not detained. Although defendant has come forward with some evidence to rebut that presumption, the presumption does not drop out of consideration completely; rather, it continues to be weighed along with other factors to be considered when deciding whether to release defendant. *Rodriguez*, 950 F.2d at 88.

Second, the Court finds by a preponderance of the evidence that defendant presents a risk of flight and that no condition or combination of conditions will reasonably assure that he will appear as required if released. The first factor of 18 U.S.C. § 3142(g)—"[t]he nature and circumstances of the offense charged, including whether the offense . . . involves a narcotic drug"—weighs heavily in favor of detention. Defendant is charged in this case with being a participant in a continuing criminal enterprise ("CCE") to distribute substantial amounts of marijuana and hashish, both of which are narcotic drugs, over approximately a 15–year period. Defendant is charged in six counts of the Superseding Indictment and faces substantial penalties if convicted. Count I of the Superseding Indictment, the CCE count, carries a mandatory life sentence.[10] Count

---

10. Defendant argues that the Court should not consider the CCE count in its analysis because he believes there is a strong likelihood that this count will be dismissed before

trial. However, the charges in an indictment are presumed to be valid. *See Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 100 L.Ed. 397 (1956). Thus, for purposes of

VI carries a five-year mandatory minimum sentence and a 40–year maximum sentence. Count VII carries a 20–year maximum sentence. Count IX carries a five-year mandatory minimum sentence and a 40–year maximum sentence. Counts X and Count XI each carry a ten-year mandatory minimum sentence and a maximum sentence of life.[11] Thus, the charges and possible sentence in this case could not be more serious under federal law, unless defendant were charged with a crime carrying the death penalty.

The second factor of § 3142(g)—"the weight of the evidence against the person"—also weighs heavily in favor of detention. The government's proffer shows that it has an overwhelming case against the defendant. The government has presented evidence, by way of affidavit and proffer, from numerous coconspirators who personally participated with defendant in the criminal activities with which he is charged in the Superseding Indictment. Moreover, the government has proffered that it has evidence to corroborate information supplied by the cooperating coconspirators.

The third factor of § 3142(g)—"the history and characteristics of the person"—likewise weighs in favor of detention. The evidence shows that defendant has lived a transient, fugitive-like lifestyle since at least 1992. During that time, he has had no permanent residence or even a country of residence. He has lived out of a suitcase, traveling extensively throughout the United States, Mexico and Canada. Prior to 1992, he traveled extensively overseas. Most, if not all, of this travel was done under false names and with false identification papers, including a false passport. He maintains only sporadic contact with his family and does not have any ties to any community anywhere. Defendant's daughter and mother both testified that since at least 1992, they have had no way to contact defendant. Instead, they have had to wait for defendant to contact them.

It does not appear that defendant has ever had any type of legal employment or legal source of income. His claims of being a film producer and gold miner appear to be merely shams to cover up his illegal drug-trafficking activities.

Defendant has a previous conviction for possession of marijuana with intent to distribute, and a history of prior arrests for similar conduct. He also has a history of using aliases and of giving law enforcement officers false names when arrested. In fact, in this case, he gave the Canadian police a false name when he was arrested.

Defendant also has a history of making and using false identification, including false birth certificates, false driver's licenses, false business cards, false identification cards and a false passport. He stated at the hearing that it was not difficult for him to obtain or manufacture false identification, including false birth certificates which he could then use to obtain other forms of false identification. Defendant also maintained a voice mail box and post office box under false names so that others could contact him. In sum, defendant had the ability to, and in fact often did, create for himself whole new personas in order to evade detection by the United States government.

The Court further finds by a preponderance of the evidence that defendant has available to him substantial financial resources should he decide to flee. The Court bases this finding on several facts. First, the government has proffered sub-

---

determining whether defendant should be detained or released pending trial, the Court must assume that the charges in the Superseding Indictment are valid and that defendant will face such charges if he goes to trial.

11. The government argues that with regard to Counts VI, VII, IX, X and XI, defendant also faces certain sentencing enhancements based on a prior drug-related felony conviction. Defendant disputes that the prior conviction was a felony. For purposes of this motion, the Court need not decide that issue.

stantial evidence that defendant has made millions of dollars over the years drug trafficking. Indeed, the government has proffered evidence from an individual named Stork that as recently as 1998, defendant made between $35 million and $55 million (Canadian) in a large hashish smuggling scheme. Second, although defendant claimed to have made little or no money since 1992 and before, he was able to travel extensively and to live a comfortable existence. Third, at the time of his arrest, defendant was in possession of $11,000 (Canadian) cash. From all of these facts, the Court infers that defendant more likely than not has substantial hidden assets at his disposal.

The Court finds defendant's character questionable. As stated above, the Court did not find defendant to be a wholly credible witness. He was evasive and often inconsistent in his answers. Defendant has a long history of deceit and improper conduct. Canadian Justice Locke probably put it best when he said that defendant "projects a clear image of a fraudsman, a persuasive salesman, and a person capable to live well beyond the poverty line at any place of his choosing in the world."

In addition to his questionable character, defendant also has a pronounced anti-government attitude. He claims that the United States government has a vendetta against him because of his views regarding the federal drug laws. He believes that marijuana and hashish are harmless and should be legalized, and that the crimes alleged against him here are not really crimes because they only involve these types of drugs. Thus, defendant appears to consider himself to be more than just a common drug dealer, he considers himself a crusader who is determined to win his battle against the government. Defendant's disdain for the government and the law make it more likely that he will not comply with the conditions of release and appear as required.[12]

Defendant argues that there are two factors that weigh strongly in favor of his release in this case. First, he argues that his record of always appearing at court proceedings as required while on bail in previous cases favors his release here. Although defendant is correct that such a record weighs in favor of release, the Court finds that it still is not persuasive enough to carry the day in this case. It does not appear that the charges defendant faced in his previous cases were as serious as the charges he faces here. While it is not absolutely clear from the record what possible sentences defendant faced in his previous cases, it is rather doubtful that before this case, he ever faced a charge with a mandatory life sentence if convicted. Further, the Court is unaware of the nature and circumstances of those previous cases and the weight of the government's evidence therein. Finally, this factor is simply outweighed by all the other factors that point toward detention.

Defendant next argues that the Court should give great, if not dispositive, weight to the fact that defendant's family members and friends have agreed to act as sureties for defendant's bail, even though they could be financially devastated should he flee. Defendant contends that his family and friends are the people who know him best and that the Court should defer to their trust in him.

While the Court appreciates the fact that defendant's family and friends have faith in his character and trust him to appear as required, the Court cannot, in good faith, after considering all the evidence, arrive at the same conclusion. Unlike most cases, the Court had an opportu-

---

12. The Court notes that at the Canadian extradition hearing, defendant admitted to smoking marijuana and hashish. Section 3142(g) expressly states that the defendant's "history relating to drug or alcohol abuse" shall be considered in determining whether a defendant should be released or detained. Thus, in this case, this factor also weighs in favor of detention.

nity in this case to evaluate defendant's character when he testified at the hearing. As stated above, the Court finds defendant to be of questionable character. The Court's finding in this regard is corroborated by the findings of Canadian Justice Locke who also had an opportunity to listen and observe defendant testify and found him to be "a fraudsman" and "a persuasive salesman." Simply put, defendant does not come across as an honest and trustworthy person; rather, he comes across like a slick salesman or con man who will do or say whatever he feels is in his own best interest, regardless of how his actions might affect others.

Further, although defendant's family and friends state in their affidavits that they are aware of the substantial punishment defendant faces in this case if he is convicted, it is not clear that they are aware of the nature and circumstances of the alleged criminal conduct, the strength of the government's case, or the defendant's past history. It has been the Court's experience that a defendant's friends and family members are often the last ones to either realize or come to grips with the reality and seriousness of the defendant's criminal conduct. In other words, they view the defendant as a loved one and have trouble accepting or even imagining that the defendant may be guilty of committing a crime. Thus, it is not surprising to the Court that defendant was able to find family members and friends willing to act as sureties in this case.

The Court further finds that defendant's anti-government attitude undermines his argument regarding the sureties. As stated above, it appears that defendant has convinced himself that the crimes charged in this case are not really criminal or serious in nature because marijuana and hashish are harmless and should be legal. He apparently believes he is being persecuted by the government and views himself as some sort of crusader against the government's anti-drug policy. It does not

take an unreasonable leap in logic to believe that if the time comes when defendant faces conviction and a possible life sentence, he may convince himself that his family and friends would want him to flee and carry on the fight or that certain sacrifices must be made in order to win the ultimate battle.

In any event, the Court finds that all the other § 3142(g) factors discussed above outweigh defendant's argument regarding the sureties. It is ultimately up to the Court to apply the factors in the statute and determine whether the defendant should be released or detained. The Court cannot abdicate such responsibility by simply deferring to the belief of defendant's friends and relatives that he will not flee.

In sum, after applying the factors in 18 U.S.C. § 3142(g) and considering the statutory presumption in 18 U.S.C. § 3142(e), the Court finds by a preponderance of the evidence that defendant presents a risk of flight if not detained and that no condition or combination of conditions will reasonably assure his presence for trial. Simply put, this defendant has a strong motive to flee and the means to do so. The motive is provided by the severe sentence that he faces if convicted and the overwhelming weight of the evidence the government has proffered against him. His transient lifestyle, his skill and history of evading government detection, his experience in manufacturing and using false identification, his lack of family or community ties, his ability to earn money through criminal activity, and his hidden assets provide him with the means to become a successful fugitive. *See United States v. Jackson,* 823 F.2d 4, 6–7 (2d Cir.1987) (use of aliases, transient lifestyle, lack of community ties, demonstrated skill in avoiding surveillance, and hidden assets are adequate facts to support detention). In fact, for this defendant, unlike most defendants, living the life of a fugitive should create little or no hardship because he will simply be returning to the same lifestyle he has led for

 

years. Although the Court realizes that pretrial detention should be ordered in only limited cases, this is certainly one of those cases. Indeed, the Court would be hard-pressed to think of a more appropriate case for detention, unless the case involved a crime of violence or a non-United States citizen.

The conditions of release set by Magistrate Judge Scott are not sufficient to reasonably assure defendant's appearance. Defendant's strong motive to flee and his apparent ability to do so make it unreasonable to believe that, if given the opportunity, he will not take flight to avoid prosecution, regardless of who posts the bail or the amount of bail posted.

Nor would home confinement and electronic monitoring reasonably assure defendant's presence as required. At most, home confinement and electronic monitoring would only reduce defendant's head start should he decide to flee. The Court finds particularly problematic the proposal that defendant be confined at his mother's home in Maryland rather than somewhere within this District. Although the Court understands that the United States Probation Office for the District in Maryland would monitor defendant, it is certainly reasonable to anticipate that if defendant flees, there would be some delay before the authorities in this District are notified and able to react.

Travel restrictions and the surrender of defendant's passport would also be ineffectual conditions in reasonably assuring defendant's presence in this case as he has a history of traveling under false names, using false identification and obtaining false passports.[13]

---

13. The Court notes that defendant has also argued that pretrial detention will hinder his ability to assist in his own defense. The Court finds this argument without merit. Defendant is in no different position than any other pretrial detainee. The problems defendant puts forth regarding his ability to repre-

*CONCLUSION*

For the reasons stated, the Court hereby revokes Magistrate Judge Scott's October 20, 1999 release order and orders that defendant be detained pending trial.

IT IS SO ORDERED.

sent himself while detained are present for every pretrial detainee. If anything, defendant in this case has the advantage of having extremely competent and capable counsel, who the Court is confident will take all steps necessary to ensure that defendant is adequately represented.