**UNITED STATES of America,**

v.

**Loretta Claire MARRA, Defendant.**

**No. 01–CR–060A.**

United States District Court,
W.D. New York.

July 23, 2001.

Bruce A. Barket, Garden City, NY, for Loretta Claire Marra.

Kathleen M. Mehltretter, U.S. Attorney's Office, Buffalo, NY, for U.S.

### DECISION AND ORDER

ARCARA, District Judge.

#### *INTRODUCTION*

Currently before the Court is the motion of defendant Loretta Claire Marra, pursuant to 18 U.S.C. § 3145(b), to revoke the detention order entered by Magistrate Judge Hugh B. Scott on June 1, 2001. Defendant asks that the Court set bail in the amount of $1,000,000 to be secured by cash, real property and personal property. The government opposes the motion. A hearing on the motion was held on July 6, 2001, at which both sides proceeded by way of proffer.

After considering the respective proffers of evidence at the hearing, reviewing the transcripts of the proceedings before the Magistrate Judge and the submissions of the parties, and hearing argument from counsel, the Court finds, pursuant to 18 U.S.C. § 3142, that no condition or combination of conditions will reasonably assure defendant's appearance as required for further proceedings. Accordingly, the Court denies defendant's motion to revoke Magistrate Judge Scott's June 1, 2001 detention order and orders that defendant be detained pending trial.

#### *BACKGROUND*

On October 17, 2000, James Charles Kopp was indicted by a federal grand jury in this District with felony charges arising from the October 23, 1998 murder of Dr. Barnett Slepian, a physician who performed reproductive healthcare services in this District. *See United States v. Kopp*, OO–CR–189A (W.D.N.Y.). Kopp has been a fugitive since November 4, 1998, initially on a material witness warrant, which was superseded by an arrest warrant on a complaint, which, in turn, was superseded by an arrest warrant on the indictment.

On March 29, 2001, French authorities apprehended Kopp in Dinan, France. That same day, defendant Marra was arrested in the Eastern District of New York pursuant to a complaint charging her with harboring Kopp while he was a fugitive, in violation of 18 U.S.C. § 1071. On the government's motion, defendant was preliminarily detained as a flight risk. Also on March 29, 2001, a search warrant was executed at the apartment which defendant shared with her co-defendant Dennis Malvasi,[1] at 385 Chestnut, Apartment 2D, Brooklyn, New York.

On April 3, 2001, a federal grand jury in this District returned an indictment against defendant Marra, charging her with two counts of obstruction of justice, in

---

**1.** Defendant claims that Malvasi is her husband, but there is no record or documentation of their marriage and defendant refuses to provide any information that would allow corroboration of that fact.

violation of 18 U.S.C. § 1503. Count 1 charged defendant with assisting the fugitive Kopp and thereby obstructing the criminal case of *United States v. Kopp*. Count 2 charged defendant with obstructing the grand jury by concealing herself in order to avoid being subpoenaed to testify before the grand jury. Also on April 3, 2001, defendant appeared before a magistrate judge in the Eastern District of New York, waived her rights under Rule 40 of the Federal Rules of Criminal Procedure, and was returned to this District for arraignment. The complaint filed in the Eastern District of New York was dismissed.

On April 10, 2001, defendant Marra was arraigned in this District before Magistrate Judge Hugh B. Scott. At that time, the government moved for pretrial detention of defendant, pursuant to 18 U.S.C. § 3142(f)(2)(A), claiming that she presents a serious flight risk. The United States Probation Office also recommended that defendant be detained pending trial.

On April 18, 2001, Magistrate Judge Scott held a detention hearing. At the hearing, the government proceeded by way of proffer with exhibits. At the conclusion of the hearing, Magistrate Judge Scott ordered that defendant be detained as a flight risk. On April 25, 2001, Magistrate Judge Scott issued a written detention order setting forth his findings and conclusions.

On May 21, 2001, defendant Marra moved for reconsideration of the April 25, 2001 detention order. Oral argument on the motion for reconsideration was held on May 25, 2001. On June 1, 2001, Magistrate Judge Scott issued a second detention order, denying the motion for reconsideration.

The instant motion for revocation of Magistrate Judge Scott's detention order was submitted on June 15, 2001. On June 25, 2001, the government filed a memorandum opposing the motion.

On June 28, 2001, the grand jury returned a superseding indictment against the defendant. The superseding indictment includes the charges in the original indictment plus two additional charges. Count 3 of the superseding indictment charges defendant with conspiring with co-defendant Malvasi to obstruct justice, in violation of 18 U.S.C. §§ 371 and 1503. Count 4 of the superseding indictment charges defendant with aiding and abetting Kopp in his flight to avoid prosecution, in violation of 18 U.S.C. §§ 1073 and 2.

As stated above, a hearing on the instant motion for revocation of the detention order was held on July 6, 2001. At the hearing, defendant offered her own written, unsworn statement in support of the motion and a letter from attorney John Broderick on her behalf.[2]

### DISCUSSION

Pursuant to 18 U.S.C. § 3142(e), a defendant must be detained before trial if no condition or combination of conditions will reasonably assure the appearance of the defendant as required. In this case, the government moved for detention of the defendant pending trial, pursuant to § 3142(e), and Magistrate Judge Scott granted the motion and ordered the defendant detained.

If a defendant is ordered detained by a magistrate judge, he or she may, under 18 U.S.C. § 3145(b), move for revocation of the detention order before the district court. Upon such motion, the district

---

**2.** Defendant's statement and the Broderick letter were not made exhibits at the hearing. According, the Court shall file them so that they are part of the record.

court must perform a *de novo* review of the magistrate judge's detention order. *United States v. Leon,* 766 F.2d 77, 80 (2d Cir.1985) (finding that a district court "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion"); *see also United States v. Colombo,* 777 F.2d 96, 100 (2d Cir.1985). When making its *de novo* review, the district court may rely on the record of the proceedings before the magistrate judge and may also accept additional evidence. *Colombo,* 777 F.2d at 98 n. 1; *Leon,* 766 F.2d at 80; *United States v. Delker,* 757 F.2d 1390, 1395–96 (3d Cir. 1985). Here, the defendant has moved this Court, pursuant to § 3145(b), to revoke Magistrate Judge Scott's detention order and to set bail in the amount of $1,000,000, secured by cash, real property and personal property.

Where the issue involves a defendant's risk of flight, the Second Circuit has observed:

The [Bail Reform Act of 1984] provides that a court should order a defendant detained pending trial if "no conditions or combination of conditions will reasonably assure the appearance of the person as required." 18 U.S.C. § 3142(e). We have interpreted § 3142(e) to require a district court to engage in a two step inquiry before ordering a defendant released or detained pending trial.

First, the court must make a finding as to whether the defendant presents a risk of flight if not detained.

Second, if the court finds that a defendant is likely to flee, then the court must proceed to the second step of the inquiry, namely, whether there are conditions or a combination of conditions which reasonably will assure the presence of the defendant at trial if he is released. The burden of proof is on the government to prove the absence of such conditions by a preponderance of the evidence.

*United States v. Shakur,* 817 F.2d 189, 194–95 (2d Cir.) (case citations omitted), *cert. denied,* 484 U.S. 840, 108 S.Ct. 128, 98 L.Ed.2d 85 (1987).

In determining whether there are conditions of release that will reasonably assure the appearance of the defendant as required, the Court must consider the factors provided in 18 U.S.C. § 3142(g):

(1) The nature and circumstances of the offense charged . . .;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

\*　　\*　　\*　　\*　　\*　　\*

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

Section 3142(g) also provides that in considering bail as a condition of release, the Court may upon its own motion or shall upon the government's motion, "conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."

The Second Circuit has warned that, in applying the factors in § 3142(g) to any

particular case, "the court should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *Shakur*, 817 F.2d at 195 (*quoting* S.Rep. No. 225, 98th Cong., 2nd Sess. 7, *reprinted* at 1984 U.S.C.C.A.N. 3182, 3189).

Applying the above principles in the instant case, the Court finds that defendant should be detained. Defendant presents a serious risk of flight if not detained. The government's proffer shows that: (1) defendant hid herself from law enforcement for over two years while aiding the fugitive Kopp in eluding an international manhunt; (2) defendant has lived for a number of years under assumed names; (3) defendant has demonstrated an ability to obtain false identification documents; (4) defendant lived at an address rented under an assumed name and was able to obtain a mail drop, pagers and cell phones under assumed names; (5) defendant has lived a fugitive lifestyle for approximately the last ten years; (6) defendant has demonstrated an ability to avoid government surveillance; (7) defendant has a history of failing to make court appearances as ordered; (8) defendant may have financial resources available, in the form of a $40,000 inheritance and gold and silver bars, which could be used to finance her flight; (9) defendant has demonstrated an ability to obtain money from other individuals who believe in her anti-abortion cause; (10) defendant has friends and acquaintances in both the United States and other countries, such as Canada, France and England, who are sympathetic to her cause and could assist her by supplying her with money and safe houses should she flee; (11) defendant has demonstrated an ability to use computers to communicate internationally, without leaving an electronic trail; (12) defendant has no ties to this District or to any other location in particular; (13) although defendant has two young children, she has demonstrated a willingness in the past to move around with them, and even left the country under an assumed name to give birth to them, in order to avoid government detection; and (14) after her arrest, defendant asked the law enforcement officers who were transporting her to let her go. These facts, when taken together, show that defendant presents a serious risk of flight.

Having found that defendant presents a serious flight risk, the Court must next determine whether there is a condition or combination of conditions which will reasonably assure defendant's presence as required. The burden of proof is on the government to prove the absence of such conditions by a preponderance of the evidence.

Applying the factors in 18 U.S.C. § 3142(g) as discussed above, the Court finds that the government has shown by a preponderance of the evidence that there is no condition or combination of conditions that will reasonably assure defendant's presence as required.

*Nature and Circumstances of the Offense Charged*

The Court notes preliminarily that this is an extraordinary case. This is not like the typical harboring case where a relative hides a fugitive for a few days in his or her house or gives the fugitive some money so that he or she can leave town. Here, according to the government, for two years, defendant actively assisted fugitive murder suspect James Kopp to elude an intense international manhunt. To accomplish this, defendant actually lived a fugitive lifestyle herself to avoid government detection, and developed complex schemes to communicate with Kopp and assist him in avoiding apprehension. Moreover, it appears that at the time of her arrest, defendant was assisting Kopp to return to

the United States where he could possibly continue his illegal activities.

Although the crimes charged against defendant in the superseding indictment are not normally considered crimes of violence, the Court cannot ignore the fact that defendant is charged with aiding and abetting a fugitive who is accused of the premeditated murder of a doctor in his home in front of his family. This case clearly has violent overtones.

This case is also unusual because the apparent motive behind the crimes allegedly committed by the defendant and Kopp is religious/political in nature. The facts as proffered by the government show that defendant is an anti-abortion zealot who believes so strongly in her cause that she is willing to go to any extreme to further it. Defendant's intense religious and political feelings and her apparent willingness to act on those feelings make it difficult to predict how she will act if released from custody.

Defendant faces a substantial sentence if convicted. Count 1 and Count 2 of the superseding indictment each carries a ten-year statutory maximum sentence, while Count 3 and Count 4 each carries a five-year statutory maximum sentence. According to the government, under the United States Sentencing Guidelines, defendant faces a potential guideline range of 97–121 months imprisonment.[3]

In sum, the Court finds that the nature and the circumstances of the offense charged weigh in favor of detention.

*Weight of the Evidence Against the Person*

It appears from the government's proffer that it has an overwhelming case against the defendant. As outlined at the hearing before Magistrate Judge Scott and the hearing before this Court, and as detailed in the complaint, *see* Government Exhibit 1, the government has substantial and direct evidence against the defendant consisting of her own words, which were recorded pursuant to court-authorized interception orders, and actions, which are recorded in the business records of Western Union and Federal Express.

In sum, the Court finds that the weight of the evidence against the defendant weighs in favor of detention.

*History and Characteristics of the Person*

As stated above, defendant has strong anti-abortion beliefs that direct her actions. The last ten years of her life have revolved around her anti-abortion activities. She has demonstrated a willingness to break the law to further her beliefs. She has been arrested on at least six occasions in three different states for her anti-abortion protest activities.[4] She has been convicted at least three times and received minor sentences. Over the last ten years, she has lived a fugitive lifestyle, living under assumed names and using false identification in order to avoid government detection. For the last two years, she has been in hiding while assisting the fugitive Kopp, who is accused of murdering an abortion provider.

---

**3.** Defendant contends that if convicted, she will only face a guideline range of 33 to 41 months. The Court need not decide this issue now, however. In considering whether defendant poses a risk of flight, the Court may certainly consider the worst-case scenario for the defendant if she is convicted. While defendant may presently believe that she has a good argument for the lower sentencing range, that view could change in the future and she may be tempted to flee if faced with the higher sentence. In any event, a sentence of 33 to 41 months is still a substantial sentence.

**4.** In addition, defendant was arrested with Kopp in Italy in 1992. *See* Government Exhibit 1.

Defendant has exhibited disdain for the government and law enforcement. She believes that the government is persecuting her and others for their Christian beliefs. In fact, her defense counsel asserted at the hearing that defendant believes that the instant prosecution and the government's insistence that she be detained are politically motivated.[5]

Defendant has also exhibited a lack of respect for the justice system and court orders. She has failed to appear and had bench warrants issued for her arrest in three of her criminal cases. One of the bench warrants is still outstanding. Further, defendant has admitted that she concealed her alleged marriage to co-defendant Malvasi from United States Probation Officers who were supervising Malvasi while he was on parole following a 1987 conviction for, *inter alia*, bombing three abortion clinics.

Defendant is Roman Catholic and devoutly religious. Yet, there is evidence that her anti-abortion beliefs are so strong that she would even ignore the directions of her own church leaders if she thought them contrary to her beliefs. In an intercepted conversation on November 6, 2000, defendant discusses the fact that co-defendant Malvasi surrendered to authorities at the request of Catholic church officials when he was wanted for the bombing of abortion clinics. She states that she did not believe that Malvasi was required to comply with the request because it was a "sinful command" that did not have to be obeyed. When asked whether she would have complied, she states, "No, I don't care if the Pope says so. He has no authority to tell me, to tell me to turn myself in for doing something morally praiseworthy." Item No. 12 at ¶ 3. This evidence tends to show that defendant would not hesitate to disobey an order of the Court if she thought it conflicted with her anti-abortion efforts.

Defendant's family ties appear to be minimal. Her parents are deceased and she is estranged from two of her three siblings. Her alleged spouse, co-defendant Malvasi, has been ordered detained pending trial by Magistrate Judge Scott. As stated above, although defendant has two young children, she has demonstrated a willingness in the past to move around with them, and even left the country under an assumed name to give birth to them, in order to avoid government detection.

Although defendant has no recent employment history, there is evidence that she may have financial resources available, in the form of a $40,000 inheritance and gold and silver bars, which could be used to finance her flight. Further, defendant has demonstrated an ability to obtain money from other individuals who believe in her anti-abortion cause. In fact, there is currently an internet site soliciting money on her behalf. *See* Government Exhibit 34.

Further, defendant has no ties to this District or any place else in particular. Her last residency was under an assumed name in a safe house she set up to avoid detection. She is essentially a career fugitive with no permanent address and a proven ability to obtain authentic false identification documents. She has the ability to, and in fact has, created for herself whole new personas in order to evade detection by the government.

Defendant is in good physical and mental health and thus faces no restrictions that would prohibit her from fleeing. The Court is not aware of any drug or alcohol abuse.

---

5. This is no evidence to support this assertion.

In sum, the Court finds that the history and characteristics of the defendant weigh heavily in favor of detention.

### Danger to Community

Although the government is not arguing that defendant should be detained because she poses a danger to the community, it is still a factor listed in § 3142(g) that the Court must consider. As stated above, defendant has participated in illegal anti-abortion activities for over ten years. She is accused of assisting a fugitive murder suspect. Moreover, as stated above, it appears that at the time of her arrest, she was helping the fugitive to return to the United States where he could possibly continue his illegal activities. *See* Government Exhibit 1. Thus, the Court finds that this factor also weighs in favor of detention.

### Proposed Sureties and Electronic Monitoring

Defendant asks that the Court set bail in the amount of $1,000,000 to be secured by cash, real property and personal property.[6] The sureties for the bail would be defendant's three brothers, Nicholas, William and Joseph Marra, and several friends. Defendant states that she and her children would stay in the home of her brother William in New Jersey and be subject to electronic monitoring.[7] Defendant argues that a $1 million bail combined with electronic monitoring is a combination of conditions that will reasonably assure her presence as required. She states that she would never flee under such conditions as it would cause her brothers bankruptcy and her friends financial hardship if they had to forfeit the collateral they are using

to secure the bail. The Court finds defendant's argument unpersuasive.

The only support for defendant's claim of loyalty to the sureties is the assertions of defense counsel and defendant's own assertions in the unsworn letter she supplied to the Court at the hearing. The Court must view these assertions cautiously, as neither defendant nor her sureties has been subject to examination by the Court or cross-examination by the government. *See Shakur*, 817 F.2d at 200. It is common for family members and friends to show support for each other, but it is not clear that the proposed sureties here are fully aware of the nature and circumstances of defendant's alleged criminal conduct, the apparent strength of the government's case, the substantial sentence that defendant faces if convicted, or defendant's past history. *See United States v. Trolinger*, 89 F.Supp.2d 386, 400 (W.D.N.Y.1999). The Second Circuit and other courts have held that a defendant's past use of aliases, transient lifestyle, skill in avoiding surveillance, and potential monetary support weigh in favor of detention despite the fact that the defendant's family and friends are willing to post a substantial bond. *See United States v. Jackson*, 823 F.2d 4 (2d Cir.1987); *Shakur*, 817 F.2d at 200; *Trolinger*, 89 F.Supp.2d at 399–400; *United States v. Chagra*, 850 F.Supp. 354 (W.D.Pa.1994).

Similarly, the only support for defendant's claim that the sureties will face financial ruin if she flees is the assertions of defense counsel and defendant's own assertions. There is no evidence regarding the proposed sureties' overall financial

---

**6.** The Court notes that although the defendant has proposed a $1 million bond to be secured by cash, real property and personal property, the government contends that the value of the collateral that defendant proposes to offer totals, at most, only $616,000.

**7.** Defendant states that she is also willing to be subject to electronic monitoring via a Global Positioning Satellite. However, according to the government, such a system is not currently available in the District of New Jersey.

status or that they would actually face bankruptcy or other severe financial hardship if defendant flees. In fact, there is some evidence that the sureties have other significant financial assets that are not being posted as bail. For example, the government proffered that in January 2001, Nicholas Marra purchased gold valued at $27,654 and resold that gold on May 3 or 4, 2001. The monies received from the sale of the gold are not being posted as bail. Further, defense counsel has represented that at least two of the sureties, Alice Grayson and Howard Walsh, have a financial "wherewithal" significantly greater than that which they would be putting at risk here. Item No. 17 at 10.

Perhaps most problematic with defendant's proposed bail package is that at least some of proposed sureties, Nicholas and William Marra in particular, appear to be sympathetic to defendant's anti-abortion cause and may be willing to make a financial sacrifice to support the defendant and the anti-abortion movement. Joseph Marra told law enforcement agents that he does not get along with his siblings, Nicholas, William and Loretta, because "of their fervent religious zeal and emphatic anti-abortion stance." See Government Exhibit 6. He explained that his parents forced their anti-abortion opinions on their four children. When Nicholas Marra was interviewed by law enforcement agents, he too acknowledged that the Marra family had participated in anti-abortion marches in the past. See Government Exhibit 2.

The government also proffered that in January 2001, Nicholas Marra attended an event to honor defendant's alleged husband, co-defendant Malvasi, for his anti-abortion activities. Specifically, Nicholas Marra attended the White Rose Banquet, which is an anti-abortion fund raiser. The money raised there goes to individuals who are serving prison terms for their anti-abortion activities, and their families.

In addition, the government has proffered that during the investigation of the defendant, Nicholas and William Marra made false statements to law enforcement agents regarding their relationship with the defendant. Specifically, they denied knowing the whereabouts of or having contact with the defendant. The government has located telephone and pager records, however, which indicate that they were, in fact, in contact with defendant.

In light of these circumstances, the Court is not persuaded by defendant's argument that the proposed bail package would dissuade her flight. Indeed, it appears more likely that the proposed sureties would be willing to risk the loss of their homes and property to obtain defendant's freedom. See Shakur, 817 F.2d at 200.

Finally, the Court finds that electronic monitoring will not reasonably assure defendant's presence as required. At most, electronic monitoring would only reduce defendant's head start should she decide to flee. The Court finds particularly problematic the proposal that defendant be confined at her brother's home in New Jersey rather than somewhere within this District. Although the Court understands that the United States Probation Office for the District of New Jersey would monitor defendant, it is certainly reasonable to anticipate that if defendant flees, there would be some delay before the authorities in this District are notified and able to react.

### CONCLUSION

For the reasons stated, the Court denies defendant's motion to revoke the June 1, 2001 detention order of Magistrate Judge Scott and hereby orders defendant detained pending trial.

The Court further orders that defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practical, from persons awaiting or serving sentences or being held in custody pending appeal.

The Court further orders that defendant be afforded reasonable opportunity for private consultation with counsel.

Finally, the Court directs that on order of a Court of the United States or on request of an attorney for the government, the person in charge of the corrections facility in which defendant is confined deliver defendant to a United States Marshal for the purpose of appearance in connection with any court proceeding.

IT IS SO ORDERED.